# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| NICHOLAS SURGEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 18-cv-00654 (TJK) |
| ) | |
| ENVIRONMENTAL PROTECTION ) | |
| AGENCY, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiff Nicholas Surgey moves for summary judgment on his claim under the Freedom of Information Act against Defendant Environmental Protection Agency (EPA). Attached with this motion are a memorandum in support of the motion and in opposition to EPA's motion for summary judgment, a statement of undisputed material facts, a response to EPA's statement of undisputed material facts, proposed order, and the declarations of Nicholas Surgey and Patrick D. Llewellyn and exhibits annexed thereto.

Dated: November 9, 2018

Respectfully submitted,

/s/ Patrick D. Llewellyn
Patrick D. Llewellyn (DC Bar No. 1033296)
Michael T. Kirkpatrick (DC Bar No. 486293)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
pllewellyn@citizen.org

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| NICHOLAS SURGEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 18-cv-00654 (TJK) |
| ) | |
| ENVIRONMENTAL PROTECTION ) | |
| AGENCY, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Nicholas Surgey filed this lawsuit under the Freedom of Information Act (FOIA) seeking the production of records unlawfully withheld by defendant Environmental Protection Agency (EPA). EPA then produced some responsive documents, and has now moved for summary judgment on both the adequacy of its search and its withholdings. The undisputed material facts, however, establish that EPA's search was inadequate and that many of its withholdings under exemptions 6, 7(E), and 7(F) are improper. Accordingly, the Court should deny EPA's motion, enter summary judgment for Mr. Surgey, and order EPA to conduct an adequate search and produce the improperly withheld records.

**BACKGROUND**

Nicholas Surgey is an investigative journalist and co-director of Documented, an organization that researches corporate influence over public policy. Surgey Decl. ¶ 1. Mr. Surgey's work has been featured in *The Guardian*, the *New York Times*, the *Los Angeles Times*, the

*Washington Post*, and other media outlets. Surgey Decl. ¶ 2. On January 8, 2018, Mr. Surgey

submitted a FOIA request to EPA requesting the following records:

> Records associated with EPA Administrator Scott Pruitt's travel to and attendance
> at the 2018 Rose Bowl college football game, which took place on January 1, 2018
> at the Rose Bowl stadium in Pasadena, California. Records should include but
> should not be limited to any emails, notes, or expense reports that describe the trip
> to Pasadena, the Rose Bowl game, and any associated meetings or events that took
> place on the same trip. Details of who paid for travel, Rose Bowl tickets, and any
> other associated costs incurred on this trip should be provided in the response.
> These records should concern travel by Scott Pruitt, as well as any other EPA staff
> (including security staff) that traveled to Pasadena as part of the same trip or
> attended the game with the Administrator.

Surgey Decl. ¶ 3; EPA Ex. A at 2 (Doc. 13-4). After receiving no response to his FOIA request,

Mr. Surgey filed this lawsuit on March 22, 2018. *See* Compl. (Doc. 1).

After the initiation of this lawsuit, EPA conducted a search for responsive records and

produced certain records to Mr. Surgey. *See* Joint Status Report of May 10, 2018 (Doc. 9); Joint

Status Report of June 28, 2018 (Doc. 10); Joint Status Report of July 27, 2018 (Doc. 11).

Specifically, EPA produced 390 pages of records with some redactions and withheld 218 pages in

full. *See* Joint Status Report of July 27, 2018.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding a motion for

summary judgment, the Court draws all reasonable inferences in the non-movant's favor. *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "FOIA cases are typically resolved on

motions for summary judgment." *Elec. Privacy Info. Ctr. v. Customs & Border Prot.*, 160 F. Supp.

3d 354, 357 (D.D.C. 2016). Where the adequacy of the search is disputed, the agency must prove

it "conducted a search reasonably calculated to uncover all relevant documents." *Steinberg v. DOJ*,

23 F.3d 548, 551 (D.C. Cir. 1994) (internal quotation marks omitted). Where the undisputed

material facts establish that the agency conducted an inadequate search, the agency "must conduct a new search that is adequate in scope, manner and location, and [must] produce any additional responsive records to" the requester. *Rodriguez v. Dep't of Def.*, 236 F. Supp. 3d 26, 41 (D.D.C. 2017).

When responsive records are located, the agency has the burden of proving that the withheld information comes within one of FOIA's nine statutory exemptions. *Summers v. DOJ*, 140 F.3d 1077, 1080 (D.C. Cir. 1998); 5 U.S.C. § 552(a)(4)(B). Summary judgment is appropriate only if the agency's "affidavits describe the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically fall within the claimed exemption[s], and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). This Court reviews the agency's claimed exemptions *de novo*. 5 U.S.C. § 552(a)(4)(B); *DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 755 (1989).

## ARGUMENT

Summary judgment should be granted in Mr. Surgey's favor with respect to both the inadequacy of the search and the challenged withholdings. First, EPA's search impermissibly narrowed Mr. Surgey's FOIA request in several ways, including by focusing only on records referencing former EPA Administrator Scott Pruitt's attendance at the college football Rose Bowl game rather than records concerning the entire trip to California during which the Rose Bowl visit occurred. Second, EPA's withholding of information and records under exemption 6 and exemptions 7(E) and 7(F) are improper. As to exemption 6, the significant public interest in the details of taxpayer-funded travel—particularly concerning a former EPA Administrator who became well-known for his mismanagement of government resources generally and unnecessary

security detail expenses specifically—outweighs any minimal privacy interest. As to exemptions 7(E) and 7(F), the blanket withholding of weekly schedules is unjustified. Although details concerning security operations may implicate these exemptions, EPA's broad invocation provides insufficient detail and explanation to carry its burden. Further, EPA has not explained why any specific information covered by exemptions 7(E) and 7(F) cannot be segregated from non-exempt information in the responsive records.

## I.      EPA's Search Was Inadequate.

"It is clear beyond cavil that 'an agency has a duty to construe a FOIA request liberally,' and that it must 'select the interpretation that would likely yield the greatest number of responsive documents.'" *Rodriguez*, 236 F. Supp. 3d at 36 (quoting *Nation Magazine, Wash. Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995), and *Conservation Force v. Ashe*, 979 F. Supp. 2d 90, 102 (D.D.C. 2013)). Consistent with this longstanding obligation, "an agency is not permitted to deny requesters information by narrowing the scope of its search to exclude relevant information." *Nat'l Sec. Counselors v. CIA*, 849 F. Supp. 2d 6, 12 (D.D.C. 2012). EPA has nonetheless performed an unduly narrow search for records responsive to Mr. Surgey's FOIA request: EPA improperly construed Mr. Surgey's FOIA request as narrowly concerned with only the Rose Bowl, failed to include searches of Ryan Jackson's and the EPA Ethics Office's records, and failed to search for travel vouchers for other EPA staff, EPA's search was inadequate.

### A.   EPA's search improperly limited Mr. Surgey's request to records specifically concerning the Rose Bowl.

Mr. Surgey requested "Records associated with EPA Administrator Scott Pruitt's travel to and attendance at the 2018 Rose Bowl college football game, which took place on January 1, 2018 at the Rose Bowl stadium in Pasadena, California. Records should include but should not be limited to any emails, notes, or expense reports that describe the trip to Pasadena, the Rose Bowl

game, and *any associated meetings or events that took place on the same trip*." EPA Ex. A at 2 (emphasis added). Although Mr. Surgey's request requested records concerning "any" events that took place during Administrator Pruitt's trip, the search terms utilized by EPA focused almost exclusively on the Rose Bowl. *See* White Decl. ¶ 10 (identifying search terms as "football," "rose bowl," "sooner*," "bulldog*," "Pasadena," and "Huntington Beach").[1] But news reports subsequent to the submission of this FOIA request—including the announcement of an investigation by EPA's Inspector General—revealed that this trip included at least one additional destination: Disneyland. *See* Surgey Decl. ¶ 4. The EPA's failure to include search terms that would identify records regarding a visit to Disneyland—for example, "Disney*," "Anaheim," "theme park," etc.—indicates that EPA improperly narrowed Mr. Surgey's request to only records concerning the Rose Bowl rather than all records concerning all parts of the trip.

Beyond the Disneyland visit, Mr. Surgey does not know what other meetings or events Mr. Pruitt attended because EPA has also withheld additional information concerning the trip, including Mr. Pruitt's schedule. Given that the Rose Bowl is a single event on January 1 and the records produced indicate that Administrator Pruitt remained in California until around January 6, he likely participated in meetings and events in addition to a trip to Disneyland that would be apparent to EPA upon reviewing his schedule in response to Mr. Surgey's request. At that point, EPA had "a duty to follow-up on any known leads," which would include conducting additional searches based on the details of the additional events and meetings. *Wallick v. Agric. Mktg. Serv.*, 281 F. Supp. 3d 56, 73 (D.D.C. 2017); *see also Campbell v. DOJ*, 164 F.3d 20, 28 (D.C. Cir. 1998)

---

[1] Elizabeth White's declaration explains that search terms followed by an asterisk used the "wildcard search function" and would have also turned up any hits including pluralized versions of those terms. *See* White Decl. ¶ 9 n.2. EPA has not explained the search term "Huntington Beach," other than that it "refer[s] to the location of the trip." *See* White Decl. ¶ 10.

("An agency has discretion to conduct a standard search in response to a general request, but it must revise its assessment of what is 'reasonable' in a particular case to account for leads that emerge during its inquiry."). EPA's declaration reflects that it did not do so.

EPA's only discussion of the "associated meetings or events" language in Mr. Surgey's request is to state that "there were no *EPA* meetings or events associated with the trip to the Rose Bowl." EPA Br. 8 (emphasis added) (citing White Decl. ¶ 7). Notably, EPA makes this point in its discussion of withholding under exemption 6 rather than in regard to the adequacy of its search. But Mr. Surgey's FOIA request plainly was not limited to "EPA" meetings or events, and EPA's admission that it interpreted his request in this way is further evidence that the agency improperly "narrow[ed] the scope of its search to exclude relevant information." *Nat'l Sec. Counselors*, 849 F. Supp. 2d at 12.

## B.   EPA failed to search for records from its Ethics Office.

In addition to records concerning the details of Mr. Pruitt's trip to California, Mr. Surgey also requested records reflecting "[d]etails of who paid for the travel, Rose Bowl tickets, and any other associated costs incurred on this trip." EPA Ex. A at 2. Despite insisting that it has no vouchers for Mr. Pruitt's own travel, EPA conducted no search that would have captured communications from its Ethics Office—communications mandated by law if an outside source paid any portion of Mr. Pruitt's expenses.

EPA's declarant states that a search for travel vouchers in the agency's electronic travel system (known as "Concur") was performed for Mr. Pruitt and for members of his Protective Service Detail (PSD). Although the search identified responsive travel vouchers for PSD members, EPA identified none for Mr. Pruitt. *See* White Decl. ¶¶ 13–15. If other record systems besides Concur likely contain such information, EPA's failure to search them renders the search

inadequate. *Campbell*, 164 F.3d at 28 (quoting *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)) ("[A]n agency 'cannot limit its search to only one record system if there are others that are likely to turn up the information requested.'"). If the Concur system is the only records system where such travel vouchers or similar documents would be located and no travel vouchers for Mr. Pruitt were identified there, his trip expenses must have been paid for by (1) Mr. Pruitt himself, (2) an entity outside of EPA, or (3) a combination of the two.

This point is significant because Office of Government Ethics regulations address the appropriate acceptance of gifts from outside sources by executive branch employees. *See* 5 C.F.R. §§ 2635.201–2635.206. The regulations also provide that employees should seek advice from the agency ethics official when questions arise as to the ethical implications of an employee's action. *Id.* § 2635.107. Within EPA, the Ethics Office within the Office of General Counsel "oversees all aspects of the Agency's ethics programs" and "is responsible for ensuring the high ethical standards of EPA employees." About the Office of General Counsel: Ethics Office, EPA, https://www.epa.gov/aboutepa/about-office-general-counsel-ogc#ethics (last visited October 2, 2018). Mr. Pruitt's then-Chief of Staff Ryan Jackson previously stated that "he is in frequent contact with the senior ethics counsel" at EPA regarding (among other things) whether certain actions by Mr. Pruitt comported with government ethical obligations. Surgey Decl. ¶ 5.

Given the clearly non-negligible value of a week-long trip to California—including airfare, meals, lodging, and tickets to the Rose Bowl, Disneyland, and other events—payment for even a portion of the trip by an outside source would almost certainly result in communications between Mr. Pruitt or his staff and EPA Ethics Office, or even an official memorandum approving or disapproving of the action. *Id.* EPA's failure to search the Ethics Office's and Ryan Jackson's

records thus undermines the adequacy of its search as it has failed to include locations that "are likely to turn up the information requested." *Campbell*, 164 F.3d at 28.

### C.  EPA did not adequately search for staff travel vouchers.

Mr. Surgey specifically requested records concerning travel by Mr. Pruitt and "any other EPA staff (including security staff)" on this trip. EPA Ex. A at 2. However, EPA's search for travel vouchers included only Mr. Pruitt and members of the PSD. *See* White Decl. ¶¶ 13–15. EPA did not search for travel vouchers associated with members of Mr. Pruitt's immediate staff—such as Milan Hupp, Mr. Pruitt's Director of Scheduling and Advance, who appears in several of the responsive emails—yet EPA's declarant does not state that Mr. Pruitt and members of the PSD were the only EPA staff to participate in this trip. Accordingly, EPA's search for travel vouchers improperly limited the scope of Mr. Surgey's FOIA request.

## II.    EPA Improperly Withheld Mr. Pruitt's Schedule Under Exemption 6.

Exemption 6 protects from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). EPA contends that details about Mr. Pruitt's trip, including his schedule and where he spent his time while in California, were properly withheld under exemption 6. *See* EPA Br. 8–9.[2] Whatever value EPA's generic arguments have for the privacy implications of a typical government employee's personal travel, they are unpersuasive here. The trip in question involved significant agency resources in the form of security detail expenses and was taken by a cabinet secretary repeatedly scrutinized by Congress, the Government Accountability Office (GAO), and

---

[2] EPA also argues that exemption 6 (along with exemption 7(C)) justified withholding in full or in part records containing identifying information for PSD members and contact information for local law enforcement personnel. *See* EPA Br. at 10–11. Although Mr. Surgey does not concede either exemption's applicability, he does not seek disclosure of this information and, thus, does not challenge EPA's withholding of it.

the agency's own Inspector General for his misuse of agency resources. The public interest in learning how Administrator Pruitt directed the expenditure of agency resources for his security detail dwarfs any minimal privacy interests in play.

EPA bears the burden of showing that disclosure of the withheld information would constitute a "clearly unwarranted" invasion of privacy. *Prison Legal News v. Samuels*, 787 F.3d 1142, 1146 (D.C. Cir. 2015). Moreover, "under Exemption 6, the presumption in favor of disclosure is as strong as can be found anywhere in [FOIA]." *Wash. Post Co. v. U.S. Dep't of Health & Human Servs.*, 690 F.2d 252, 261 (D.C. Cir. 1982). In determining whether disclosure would result in a "clearly unwarranted invasion of personal privacy," courts "balance the public interest in disclosure against the interest Congress intended [exemption 6] to protect." *Am. Immigration Lawyers Ass'n v. Exec. Office for Immigration Rev.* (*AILA*), 830 F.3d 667, 673 (D.C. Cir. 2016) (citation and internal quotation marks omitted). The court must first ask whether "disclosure would compromise a substantial, as opposed to a *de minimis*, privacy interest," *id.* at 673–74 (internal quotation marks omitted) (quoting *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 33 (D.C. Cir. 2002)); where disclosure would compromise only a *de minimis* privacy interest, the exemption does not apply and the information must be disclosed, *Nat'l Ass'n of Retired Fed. Emps. v. Horner* (*NARFE*), 870 F.2d 873, 874 (D.C. Cir. 1989). If disclosure implicates a substantial privacy interest, the court must "weigh the privacy interest at stake against the public interest in the release of the records." *AILA*, 830 F.3d at 673 (internal quotation marks omitted). "Exemption 6's requirement that disclosure be 'clearly unwarranted' instructs [courts] to tilt the balance (of disclosure interests against privacy interest) in favor of disclosure." *Gilman v. DHS*, 32 F. Supp. 3d 1, 10 (D.D.C. 2014) (internal quotation marks omitted) (quoting *Morley v. CIA*, 508 F.3d 1108, 1127 (D.C. Cir. 2007)).

EPA cannot meet the exemption 6 standard. For responsive records concerning portions of the trip that involved visits to widely attended events or attractions—such as the Rose Bowl or Disneyland—Mr. Pruitt has no more than a *de minimis* privacy interest. And as to his schedule, the public interest in disclosure of these details outweighs any privacy interest given the multiple investigations into his misuses of agency resources.

### A.  Mr. Pruitt has only a *de minimis* privacy interest in disclosure of visits to popular attractions.

EPA acknowledges that Mr. Pruitt took his trip primarily to attend the 2018 Rose Bowl—a game with tens of thousands of attendees and broadcast on national television to millions of viewers. *See* Maghen Moore, *2018 Rose Bowl Had Third-Largest Cable Audience, According to Nielson*, Atlanta Journal Constitution (Feb. 18, 2018), https://www.ajc.com/sports/2018-rose-bowl-game-becomes-third-largest-cable-audience-ever-reported-according-nielson/kmJai1G9Y6Smmmn3OdU7SN/ (noting more than 28 million people watched the 2018 Rose Bowl). Similarly, as noted above, other publicly available information indicates that Mr. Pruitt's trip included a visit to Disneyland, one of the most popular and notoriously crowded theme parks in the country. *See* Sean Murray, *Disneyland Is Discreetly Removing Benches and Chairs as It's Becoming Harder to Get Around*, The Travel (Oct. 4, 2018), https://www.thetravel.com/disneyland-removing-chairs-benches/ (noting Disneyland has an average of 50,000 visitors per day). Thus, there can be no doubt that Mr. Pruitt's trip included a number of activities that could hardly be described as "private."

Although EPA has disclosed some details concerning Mr. Pruitt's attendance at the Rose Bowl, it has entirely withheld other information concerning his California trip, including his visit

to Disneyland or similar sites.[3] Given the public nature of Disneyland, it is difficult to see how disclosure of such information would implicate more than a *de minimis* privacy interest. This information does not amount to "intimate personal details the disclosure of which would be likely to cause embarrassment." *Pinson v. DOJ*, 202 F. Supp. 3d 86, 109 (D.D.C. 2016) (quoting *Ripskis v. HUD*, 746 F.2d 1, 3 (D.C. Cir. 1984)). In an analogous situation, the Southern District of Georgia concluded that the disclosure of the list of invitees to a "public ceremony that was extensively covered by newspapers, broadcast on television and attended by over two thousand people" implicated no more than a *de minimis* privacy interest. *Sikes v. United States*, 987 F. Supp. 2d 1355, 1367–69 (S.D. Ga. 2013). Here, disclosure of Mr. Pruitt's visits to Disneyland or similar sites would reveal only that he—like millions of other people—visited tourist attractions open and visible to the public. At least as to these details, EPA cannot show that any more than a *de minimis* privacy interest is implicated.

**B. The public interest in disclosure easily outweighs any privacy interest.**

Whatever privacy interest is implicated by the details of Mr. Pruitt's trip to California falls well short of the public interest in disclosing the details of his schedule in California. The public interest in disclosure is measured by "the extent to which disclosure would serve the 'core purpose of the FOIA,' which is 'contributing significantly to public understanding of the operations or activities of the government.'" *AILA*, 830 F.3d at 674 (quoting *U.S. Dep't of Defense v. Fed. Labor Relations Auth.*, 510 U.S. 487, 495 (1994)). Put simply, "the basic purpose of FOIA focuses on the citizens' right to be informed about what their government is up to." *Multi Ag Media LLC v.*

---

[3] Because EPA has withheld nearly every detail of Administrator Pruitt's schedule, Mr. Surgey cannot know whether his trip included visits to similar widely-attended sites.

*Dep't of Agric.*, 515 F.3d 1224, 1231 (D.C. Cir. 2008) (alterations adopted) (internal quotation marks omitted) (quoting *Reporters Comm. for Freedom of Press*, 489 U.S. at 773).

EPA frames Mr. Pruitt's trip as merely a "personal family vacation trip," arguing that "there is little legitimate public interest" where the requested information is "about private citizens, rather than a record of government actions." *See* EPA Br. 8 (citing *Akin, Gump, Strauss, Hauer & Field, L.L.P. v. DOJ*, 503 F. Supp. 2d 373, 382 (D.D.C. 2007)).[4] This case, however, does not involve information that about "private citizens." Rather, Mr. Surgey's FOIA request sought records showing how a member of the President's cabinet made use of government resources for a trip. *See* Compl. ¶ 5. And the records released thus far show extensive use of government resources in arranging Mr. Pruitt's and the PSD's travel to and from California, as well as coordinating transportation and scheduling while he was in California. Surgey Decl. ¶ 9. Tellingly, one member of the PSD even referred to the trip as "the EPA visit to CA." *Id.* ¶ 10. EPA has also disclosed a record revealing that the total travel expenses for PSD members for this six-day trip was nearly $15,000, such that Mr. Pruitt's trip cost taxpayers approximately $2500 *per day* for his security detail. *Id.* ¶ 11.

EPA cannot (and does not) dispute that there is a substantial public interest in learning how much the federal government spent in connection with Mr. Pruitt's trip. Disclosure of government expenditures is a quintessential example of revealing "what the government is up to." *See Multi Ag Media LLC*, 515 F.3d at 1231–32; *Brock v. Pierce Cty.*, 476 U.S. 253, 262 (1986) ("[T]he protection of the public fisc is a matter that is of interest to every citizen."). But beyond learning

---

[4] *Akin Gump* is not pertinent here. The opinion gives no indication that the records at issue concerned expenses incurred by a cabinet member's travel or any remotely similar issue. *Akin Gump*, 503 F. Supp. 2d at 377–78, and the opinion does not discuss the public interest prong of exemption 6 because the court concluded the government had not shown that disclosure would violate a substantial privacy interest. *Id.* at 382.

the *amount* of government expenditure, there is an equally compelling public interest in revealing *how* the government spends public funds. *See News-Press v. U.S. Dep't of Homeland Sec.*, 489 F.3d 1173, 1196 (11th Cir. 2007) (concluding public interest in learning whether federal agency "has been a proper steward of billions of taxpayer dollars is undeniable and powerful"); *United States v. Suarez*, 880 F.2d 626, 630 (2d Cir. 1989) ("[T]here is an obvious legitimate public interest in how taxpayers' money is being spent, particularly when the amount is large."). As Mr. Surgey explains in his declaration, disclosure of Mr. Pruitt's schedule in California will allow the public to evaluate how EPA spent its resources and whether EPA's utilization of significant resources for this trip was based on a legitimate need. Surgey Decl. ¶ 6.

The public interest in disclosure of the schedule is further amplified by the repeated scrutiny of Mr. Pruitt's mismanagement of agency resources. *Id.* ¶ 7. First, a recent report from EPA's Office of Inspector General (OIG) publicly revealed details concerning Mr. Pruitt's excessive spending on PSD. *Id.* ¶ 7(a); *see* EPA, OIG, 18-P-0239, *EPA Asserts Statutory Law Enforcement Authority to Protect Its Administrator but Lacks Procedures to Assess Threats and Identify the Proper Level of Protection* (Sept. 4, 2018), https://www.epa.gov/sites/production/files/2018-09/documents/_epaoig_20180904-18-p-0239.pdf (OIG Report) (attached as Ex. 1 to Llewellyn Decl.). The OIG Report found, for example, that compared to the agency under his predecessor, the EPA under Mr. Pruitt increased its spending on PSD payroll by 92.8%—and increased spending on PSD travel by a staggering 216.2%. *See id.* at 12. The OIG report concluded EPA's security detail protocol lacked both a standard operating procedure and a firm grounding in threat analysis to justify how much protection to provide the administrator. *Id.* at 12–13. Of particular relevance to this case, the OIG Report determined the $1.6 million increase in PSD's costs under Mr. Pruitt occurred "without documented justification."

*Id.* at 9. The OIG Report received widespread attention in national and international news outlets, *see* Surgey Decl. ¶ 7(a), confirming the significant public interest in this issue.

Second, in addition to the OIG's specific investigation and report, Mr. Pruitt faced a number of other investigations for his misuse of agency resources. For example, on April 16, 2018, the GAO issued a report concluding EPA violated federal law by paying over $43,000 to install a soundproof privacy booth for Mr. Pruitt. *See* Surgey Decl. ¶ 7(b); GAO, *U.S. Environmental Protection Agency—Installation of Soundproof Privacy Booth*, B-329603 (Apr. 16, 2018), https://www.gao.gov/assets/700/691272.pdf (attached as Ex. 2 to Llewellyn Decl.). Moreover, Mr. Pruitt has been—and apparently continues to be—subject to a months-long investigation by the House Committee on Oversight and Government Reform into numerous issues concerning proper management of agency resources—including costs for his travel and the utilization of his security detail. *See* Surgey Decl. ¶ 7(c); Letter from Trey Gowdy, Chairman, House Committee on Oversight and Government Reform, to Scott Pruitt, Administrator, EPA (Apr. 13, 2018), https://oversight.house.gov/wp-content/uploads/2018/04/2018-04-13-TG-to-Pruitt-EPA-re-Travel-and-TIs-due-4-27.pdf (requesting that Mr. Pruitt produce, among other items, documents relating to agency travel of one EPA special agent, travel vouchers for all EPA employees for two international trips, and documents related to Mr. Pruitt's use of 24-hour security) (attached as Ex. 3 to Llewellyn Decl.); Letter from Trey Gowdy, Chairman, House Committee on Oversight and Government Reform, to Scott Pruitt, Administrator, EPA (Apr. 11, 2018), https://oversight.house.gov/wp-content/uploads/2018/04/2018-04-11-TG-to-Pruitt-EPA-Travel-Follow-up-due-4-25.pdf (requesting that Mr. Pruitt produce, among other items, documents concerning his first- or business-class travel at EPA's expense) (attached as Ex. 4 to Llewellyn Decl.).

These investigations and official findings of misuse of agency resources firmly establish the public interest in disclosing Mr. Pruitt's California trip schedule. *See also* Surgey Decl. ¶ 8.

***

The public interests in understanding how EPA utilized agency resources and in determining whether misuse of agency resources occurred are significant and substantial. Accordingly, the public interest in disclosure outweighs any minimal privacy interest in withholding Mr. Pruitt's schedule in California. EPA improperly relied on exemption 6 to withhold this information.

## III.   EPA Has Misapplied Exemptions 7(E) and 7(F) to Withhold Several Categories of Information.

EPA also argues that some information is protected from disclosure under exemptions 7(E) and 7(F). Specifically, EPA has withheld (1) PSD travel vouchers and travel schedules, (2) PSD "logistical coordination," and (3) a "Joint Special Event Threat Assessment." EPA Br. 11–18. Mr. Surgey does not seek either the "Joint Special Event Threat Assessment" or the 37 records identified as "PSD Travel Documents." *See Vaughn* Index 2.[5] However, EPA cannot rely on exemptions 7(E) and 7(F) to withhold what the agency refers to as the PSD's "travel details" and "logistical coordination," *see Vaughn* Index 4–5, at least not with the breadth that EPA has applied those exemptions.

Exemption 7(E) allows an agency to withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records

---

[5] EPA's memorandum repeatedly references PSD "travel schedules." Presumably, those records are what EPA referred to in its *Vaughn* Index as "weekly schedules," described as "six copies of the PSD weekly schedule for the week of December 31, 2017–January 6, 2018." *See Vaughn* Index at 1. If the "travel schedules" are not the "weekly schedules," EPA has made no argument to support its withholding of the PSD weekly schedules.

or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). The D.C. Circuit has made clear that exemption 7(E) applies only when disclosure would "risk circumvention of the law," regardless of whether the withheld information amounts to "techniques and procedures" or "guidelines" for investigations or prosecutions. *See Pub. Emps. for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mex.* (*PEER*), 740 F.3d 195, 204 n.4 (D.C. Cir. 2014) (citing *Blackwell v. FBI*, 646 F.3d 37, 41–42 (D.C. Cir. 2011)); *see also Sack v. U.S. Dep't of Defense*, 823 F.3d 687, 694 (D.C. Cir. 2016).

Exemption 7(F) allows agencies to withhold information that "could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F). The touchstone for exemption 7(F) is whether the government can show "a reasonable expectation of endangerment" from disclosure. *PEER*, 740 F.3d at 205.

Here, Mr. Surgey seeks information reflecting the general locations visited by Mr. Pruitt and his PSD—such as tourist attractions and hotel names. None of this information can properly be considered "law enforcement guidelines," nor has EPA shown that disclosure can reasonably be expected to result in either circumvention of the law or endangerment to any individual.

**A.  EPA has not justified withholding PSD weekly schedules.**

EPA's argument for withholding the PSD's weekly schedules under both exemptions 7(E) and 7(F) is, essentially, that releasing them would tell malicious actors how many agents traveled with Mr. Pruitt, a fact that EPA says could be used to carry out future attacks. *See* EPA Br. 12–15. Importantly, EPA does not appear to argue that much of the information that would be contained within the weekly schedules—such as locations of travel within California and modes of

transportation—warrants withholding under these exemptions.[6] Instead, EPA's only argument is that, because the weekly schedules are individualized, disclosing them would allow the public to derivatively determine how many security personnel accompanied Mr. Pruitt to California. In other words, because of the form in which EPA maintains non-exempt information, Mr. Surgey cannot obtain it. Contrary to EPA's arguments, however, the circumstances of this case make clear that EPA cannot withhold the number of PSD agents that traveled to California for at least two reasons.

First, EPA has not argued that the security detail on this trip reflected typical staffing levels. In fact, publicly available documents suggest that there was no typical staffing level for this—or any other—trip by Mr. Pruitt. The OIG Report concluded that the agency's PSD "has no final, approved standard operating procedures that address the level of protection required for the Administrator or how those services are to be provided." *See* OIG Report 9.[7] Even if EPA adhered to an informal protocol under Mr. Pruitt, the OIG Report indicates PSD procedures have already been altered following his departure in July 2018. For instance, when Mr. Pruitt's tenure began, the agency's PSD staff consisted of six full-time agents, which he increased to ten full-time agents plus nine part-time agents shortly after taking office. *Id.* at 8. He also expanded his own PSD protection from "door-to-door" (protection limited to work commutes) to round-the-clock (protection twenty-four hours a day, seven days a week). *Id.* Both changes, however, appear to have ceased following Mr. Pruitt's resignation. *See id.* (noting that PSD's nineteen-agent staff and

---

[6] EPA's *Vaughn* Index indicates these withholdings include the identities, contact information, and "employee ID numbers" of the PSD members. *Vaughn* Index 2, 4. Mr. Surgey does not seek this information and, as stated previously, does not challenge the EPA's withholding of this information under exemptions 6 and 7(C). *See supra* n.2.

[7] The OIG Report found that an EPA committee issued formal guidance for PSD most recently in 2003. Administration officials began drafting a full set of standard operating procedures in 2011, but it still has not been finalized or adopted "due to staff shortages." *See id.* at 9–10.

24/7 protection continued "[u]ntil the Administrator Pruitt's [sic] departure"). In other words, how many PSD agents accompanied him on his trip would not provide information about any "future policy or conduct" by EPA in PSD staffing. EPA Br. 13. Moreover, EPA's concern with withholding information about PSD "staffing information" and "staffing levels," EPA Br. 13, 15, is undercut by the OIG Report's disclosure of the overall size of the PSD.

Second, EPA has not explained how merely knowing the number of agents accompanying Mr. Pruitt would pose a danger to anyone or risk circumvention of the law. Instead, EPA relies entirely on an unpublished decision from the Southern District of New York permitting the U.S. Secret Service to withhold under exemptions 7(E) and 7(F) the number of Secret Service agents who traveled on campaign flights with each of the 2016 U.S. Presidential candidates. *See* EPA Br. 13 (citing *N.Y. Times Co. v. U.S. Secret Serv.*, No. 17 Civ. 1885 (PAC), 2018 WL 722420, at *10–11 (S.D.N.Y. Feb. 5, 2018)). But as that court explained, the Secret Service has a well-established protocol developed through "meticulous advance work and threat assignments developed . . . to identify potential risks to its protectees." *Id.* at *5. Indeed, the court concluded from the information provided by the Secret Service's declarant that "[t]he sought after disclosure would in fact effect [sic] more than the next Presidential campaign; disclosure of the staffing levels in 2016 would yield information on *all* future flights by those protected pursuant to the Service's mandate, not just future Presidential campaign flights." *Id.* at *8. Those facts stands in stark contrast with this case, where disclosure would reveal staffing levels at a time when EPA lacked a uniform protocol and given that the agency has since changed its procedures. Accordingly, EPA's withholding of this information under exemptions 7(E) and 7(F) was improper.

In any event, EPA has not explained why these concerns cannot be addressed through redaction of specific information as opposed to blanket withholding of the weekly schedules.

EPA's description of the records states that there are "six *copies* of the PSD weekly schedule for the week of December 31, 2017-January 6, 2018" and subsequently refers to the PSD weekly schedules as "this *record*." *Vaughn* Index 1 (emphases added). As such, it appears that there is one weekly schedule that would ostensibly contain both the specific information EPA is concerned with—such as each PSD member's shift and "tactical role"—as well as more general information—such as the locations visited and the time periods spent at each. It would seem implausible that the weekly schedule would contain *only* the shifts and "tactical roles" of PSD members without the locations and times of their assignments.

Because EPA has not met its burden of showing that releasing PSD weekly schedules would reveal law enforcement guidelines, risk circumvention of the law, or endanger anyone's life or safety, its withholding of them—or at least its withholding in full—under exemptions 7(E) and 7(F) was improper.

### B. EPA has not justified withholdings of PSD "logistical coordination," "travel details," or "combined passages" containing this information.

EPA has withheld information in several emails as PSD "logistical coordination" or "travel details" and has also withheld certain portions of documents as "combined passages" that contain information concerning "the scheduling and logistics of the PSD in the context of the Administrator and his family's personal vacation plans." *Vaughn* Index 4, 5, 11–15. EPA's explanation of the withheld "combined passages" leaves the basis of each redaction unclear, but based on EPA's other arguments, EPA appears to be (1) relying on exemption 6 to redact the details of Mr. Pruitt's schedule in California, (2) relying on exemptions 6 and 7(C) to withhold the names and contact information of PSD members and local law enforcement, and (3) relying on exemptions 7(E) and 7(F) to withhold "logistical coordination" and "travel details" information. *See id.*; EPA Br. 8–17. Mr. Surgey has addressed the exemption 6 withholdings of Mr. Pruitt's

schedule above, *see supra* Part II, and does not seek the names or contact information of PSD members or local law enforcement. As to the "logistical coordination" and "travel details," at least some of the information EPA has withheld either standing on its own or as part of these "combined passages" cannot properly be withheld under exemptions 7(E) and 7(F).

As to the "travel details," EPA advances the same argument on which it relied to withhold the PSD weekly schedules in full: that disclosing this information would reveal the number of PSD members utilized throughout the trip. *See* EPA Br. 12–15; *Vaughn* Index 4–5. For the reasons explained above, withholding on this basis under exemptions 7(E) and 7(F) is improper. *See supra* Part III.A. As to the "logistical coordination" information, EPA's description similarly includes "the number of Special Agents protecting the Administrator at a given time, positioning of Special Agents in different circumstances, and strategic discussion of how to approach protection challenges." *Vaughn* Index 4. Mr. Surgey does not generally seek this type of information.

However, review of the records produced—in particular portions withheld as "combined passages"—make it unclear how broadly EPA is relying on "travel details" and "logistical coordination" to withhold information contained in schedules under exemptions 7(E) and 7(F). For example, several of the "combined passages" appear to be a full schedule of the events that occurred on the California trip, such that it is unclear whether EPA has withheld basic locational information—such as the names of tourist attractions, hotels, and restaurants—as "travel details" and "logistical coordination" rather than only specific operational information, such as the exact role each particular PSD member fulfilled at particular times. Indeed, under EPA's explanation of the "travel details" information withheld, EPA included "airline names," "airport names and codes," and "flight numbers." *Vaughn* Index 4. EPA's motion makes no argument that this information is exempt from disclosure, but the *Vaughn* Index suggests that the information was

20

withheld. The *Vaughn* Index thus also raises questions as to how broadly EPA has relied on "travel details" and "logistical coordination" to withhold information.

To the extent EPA has withheld basic location information under exemptions 7(E) or 7(F), such withholding is improper. As previously discussed, exemption 7(E) protects only law enforcement "techniques and procedures" or "guidelines" the disclosure of which would "risk circumvention of the law," 5 U.S.C. § 552(b)(7)(E), and exemption 7(F) covers only information that, if disclosed, "could reasonably be expected to endanger the life or physical safety of any individual," *id.* § 552(b)(7)(F). Details about the public attractions visited or accommodations utilized by Mr. Pruitt and his protection detail during the course of his trip would not (1) constitute either law enforcement "techniques and procedures" or "guidelines," (2) risk circumvention of the law, or (3) endanger the life or safety of anyone. EPA has not claimed that Mr. Pruitt visited any sensitive or secure locations on his trip, such that disclosure would reveal anything more than public places any person could visit. EPA has not argued that simply knowing that Mr. Pruitt visited a particular attraction, dined at a particular restaurant, or stayed at a particular hotel would reveal information protected by exemptions 7(E) and 7(F).[8] Accordingly, to the extent EPA has withheld such information under exemption 7(E) or exemption 7(F), that withholding is improper.

### C. EPA has waived any argument that exemption 7(C) or exemption 6 applies to "travel details" or "logistical coordination" beyond the identities and contact information of PSD members and local law enforcement personnel.

As discussed above, exemption 6 protects from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Similarly, exemption 7(C) covers information compiled for law

---

[8] Moreover, neither exemption 7(E) or 7(F) would support such an argument. Disclosure of the fact that Pruitt visited Disneyland, for example, would reveal nothing that any would-be lawbreaker could use to violate the law or cause harm.

enforcement purposes where disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." *Id.* § 552(b)(7)(C). In its brief, EPA correctly declines to justify its withholding of the weekly schedules, "travel details," or "logistical coordination" under exemption 6 or exemption 7(C)—beyond the names and contact information of PSD members or law enforcement personnel. *See* EPA Br. 9–17. Nonetheless, EPA's *Vaughn* Index indicates exemption 6 and/or exemption 7(C) as a basis for withholding of "ticket numbers, airline names, confirmation numbers, airport names and codes, and flight numbers associated with [PSD] travel." *Vaughn* Index 4. Because EPA has failed to argue that these withholdings are proper under exemptions 6 and 7(C), it has waived any argument as to those exemptions. *See Benton v. Laborers' Joint Training Fund*, 121 F. Supp. 3d 41, 51–52 (D.D.C. 2015). Accordingly, any such information in the weekly schedules, "travel details," "logistical coordination," or "combined passages" withheld on this basis must be disclosed.

## IV.    EPA Must Conduct Additional Segregability Reviews.

As EPA's *Vaughn* index makes clear, EPA has withheld several blocks of text contained in the records produced based on a mix of exemptions. *See, e.g.*, *Vaughn* Index 5 (described "Combined Passages" where EPA redacted portions of entire text block under exemptions 6, 7(C), 7(E), and 7(F)). Mr. Surgey challenges many of the bases for redactions under exemptions 6, 7(E), and 7(F) above. *See supra* Parts II–III. Moreover, EPA's concerns with disclosure of PSD and local law enforcement identities and contact information can easily be addressed through particularized redactions of that specific information. To the extent the Court rules in Mr. Surgey's favor on any of the disputed withholdings, it should also order EPA to conduct additional segregability reviews of any blocks of text for which EPA relied on multiple exemptions to ensure that all "reasonably segregable portion[s]" of the records are provided. 5 U.S.C. § 552(b).

## CONCLUSION

For the above-stated reasons, the Court should deny EPA's motion for summary judgment and grant Mr. Surgey's cross-motion for summary judgment.

Dated: November 9, 2018

Respectfully submitted,

/s/ Patrick D. Llewellyn
Patrick D. Llewellyn (DC Bar No. 1033296)
Michael T. Kirkpatrick (DC Bar No. 486293)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
pllewellyn@citizen.org

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

)
NICHOLAS SURGEY,                )
)
         Plaintiff,       )
)
    v.                   )      Civil Action No. 18-cv-00654 (TJK)
)
ENVIRONMENTAL PROTECTION   )
AGENCY,                  )
)
        Defendant.    )
_____)

**PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

1. Plaintiff Nicholas Surgey is an investigative journalist and co-director of Documented, an organization that researches corporate influence over public policy. Surgey Decl. ¶ 1.

2. Mr. Surgey's work has been featured in *The Guardian*, the *New York Times*, the *Los Angeles Times*, the *Washington Post*, and other media outlets. Surgey Decl. ¶ 2.

3. On January 8, 2018, Mr. Surgey submitted the FOIA request at issue in this case to the U.S. Environmental Protection Agency (EPA), requesting the following:

> Records associated with EPA Administrator Scott Pruitt's travel to and attendance at the 2018 Rose Bowl college football game, which took place on January 1, 2018 at the Rose Bowl stadium in Pasadena, California. Records should include but should not be limited to any emails, notes, or expense reports that describe the trip to Pasadena, the Rose Bowl game, and any associated meetings or events that took place on the same trip. Details of who paid for travel, Rose Bowl tickets, and any other associated costs incurred on this trip should be provided in the response. These records should concern travel by Scott Pruitt, as well as any other EPA staff (including security staff) that traveled to Pasadena as part of the same trip or attended the game with the Administrator.

Surgey Decl. ¶ 3; EPA Ex. A at 2 (Doc. 13-4).

4. Since the submission of Mr. Surgey's FOIA request, news reports and other publicly available information—including the announcement of an EPA Office of Inspector General investigation at the request of a member of Congress—have revealed that Mr. Pruitt's trip to California included at least one additional, specific destination beyond the Rose Bowl: Disneyland. Surgey Decl. ¶ 4.

5. EPA has not produced any records concerning who paid for Mr. Pruitt's travel or expenses in California. Surgey Decl. ¶ 5.

6. EPA's search for responsive records did not include either the EPA's Ethics Office or records in the possession of Mr. Pruitt's then-Chief of Staff Ryan Jackson. Surgey Decl. ¶ 5; White Decl. ¶¶ 7–18 (Doc. 13-2).

7. EPA's search for records reflecting the expenses incurred on Mr. Pruitt's trip to California was limited to a search for travel vouchers for either Mr. Pruitt or members of his Protective Security Detail (PSD) within EPA's Concur travel system. White Decl. ¶¶ 13–15.

8. Disclosure of Mr. Pruitt's schedule in California will reveal the types of activities EPA apparently concluded required significant security detail and will allow the public to evaluate whether EPA's utilization of significant resources for this trip was based on a legitimate need to do so. Surgey ¶ 7.

9. The records EPA has produced thus far show extensive use of government resources in arranging Mr. Pruitt's and his PSD's travel to and from California, as well as in coordinating transportation and scheduling while in California. Surgey ¶ 9.

10. A PSD member referred to Mr. Pruitt's trip to California as "the EPA visit to CA." Surgey ¶ 10.

11. The total PSD travel costs incurred by EPA for Mr. Pruitt's trip to California was

$14,826.64. Surgey ¶ 11.

Dated: November 9, 2018                         Respectfully submitted,

                                                /s/ Patrick D. Llewellyn
                                                Patrick D. Llewellyn (DC Bar No. 1033296)
                                                Michael T. Kirkpatrick (DC Bar No. 486293)
                                                Public Citizen Litigation Group
                                                1600 20th Street NW
                                                Washington, DC 20009
                                                (202) 588-1000
                                                pllewellyn@citizen.org

                                                *Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
NICHOLAS SURGEY,                        )
                                        )
                Plaintiff,              )
                                        )
        v.                              )          Civil Action No. 18-cv-00654 (TJK)
                                        )
ENVIRONMENTAL PROTECTION                )
AGENCY,                                 )
                                        )
                Defendant.              )
_____)

**PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS**
**TO WHICH THERE IS NO GENUINE ISSUE**

1. On January 8, 2018, Plaintiff submitted a FOIA request using the FOIAonline website. FOIAonline is the online FOIA tracking system which EPA uses to receive and respond to FOIA requests, including to communicate with requesters and to publicly post records released under FOIA. *See* Declaration of Elizabeth White ("White Decl.") ¶ 3 and n.1.

   **PLAINTIFF'S RESPONSE:** Undisputed.

2. Plaintiff sought "[r]ecords associated with EPA Administrator Scott Pruitt's travel to and attendance at the 2018 Rose Bowl college football game, which took place on January 1, 2018 at the Rose Bowl stadium in Pasadena, California. Records should include but should not be limited to any emails, notes, or expense reports that describe the trip to Pasadena, the Rose Bowl game, and any associated meetings or events that took place on the same trip. Details of who paid for travel, Rose Bowl tickets, and any other associated costs incurred on this trip should be provided in the response. These records should concern travel by Scott Pruitt, as well as any other EPA staff (including security staff) that traveled

to Pasadena as part of the same trip or attended the game with the Administrator." *Id.*, Ex. A.

**PLAINTIFF'S RESPONSE:** Undisputed

3. On January 9, 2018, FOIAonline generated an automated message confirming receipt of Plaintiff's FOIA request and provided Plaintiff with an assigned tracking number (EPA-HQ-2018-003188). EPA's National FOIA Office assigned the request to the Office of the Executive Secretariat ("OEX"), Office of the Administrator. White Decl. at ¶ 4.

**PLAINTIFF'S RESPONSE:** Undisputed.

4. On February 16, 2018, the National FOIA Office responded to Plaintiff's request for a fee waiver. EPA determined that fees would not reach a billable amount and that no charges would be associated with processing this request. *Id.* at ¶ 5.

**PLAINTIFF'S RESPONSE:** Undisputed.

5. On March 22, 2018, Plaintiff filed his Complaint (ECF No. 1) pursuant to FOIA.

**PLAINTIFF'S RESPONSE:** Undisputed.

6. EPA Administrator Scott Pruitt's ("the Administrator's") trip to the 2018 Rose Bowl was a personal family vacation trip and there were no EPA meetings or events associated with the trip to the Rose Bowl. White Decl. at ¶ 7.

**PLAINTIFF'S RESPONSE:** Disputed. Regardless of the purpose of Mr. Pruitt's trip, his trip to California involved the utilization of significant government resources, specifically those of his Protective Security Detail (PSD), and one member of the PSD referred to the trip as "the EPA visit to CA." Surgey Decl. ¶¶ 9–11. Further disputed to the extent that EPA suggests Mr. Surgey's FOIA request was limited to "EPA" meetings or events. Surgey Decl. ¶ 3; EPA Ex. A at 2 (Doc. 13-4).

7. On May 11, 2018, EPA staff submitted a search request to EPA's eDiscovery Service team to search for Microsoft Outlook records dated from December 1, 2017 through January 8, 2018. The search included the three EPA Microsoft Outlook accounts that could have been used by the Administrator to send or receive correspondence during the relevant time frame and the accounts for Milan Hupp, the Administrator's Director of Scheduling and Advance, Hayley Ford, Deputy White House Liaison and Personal Aid to the Administrator, and Lincoln Ferguson, Senior Advisor to the Administrator for Public Affairs. Accounts for Special Agents in the Office of Criminal Enforcement and Forensics Training (OCEFT) who would have been a part of or supported the Administrator's Protective Service Detail (PSD) were searched as well. *Id.* at ¶ 8.

**PLAINTIFF'S RESPONSE:** Undisputed.

8. The search request included the following search terms: "football," "rose bowl," "Pasadena," "Huntington Beach," "sooner*," or "bulldog*."[1]

**PLAINTIFF'S RESPONSE:** Undisputed.

9. These search terms would locate responsive records because Plaintiff's request sought, "[r]ecords associated with EPA Administrator Scott Pruitt's travel to and attendance at the 2018 Rose Bowl college football game … any emails notes or expense reports that describe the trip to Pasadena, the Rose Bowl game, and any associated meetings or events that took place on the same trip." Ex. A at 2. The terms "football," "rose bowl," "sooner*," or "bulldog*," were used to capture records concerning the 2018 Rose Bowl game where the University of Oklahoma Sooners played and lost to the University of Georgia Bulldogs.

---

[1] The terms with an asterisk following them used the wildcard search function to capture any pluralization of the terms. For example, the term "sooner*" would also capture "sooners." *Id.* at ¶ 9 n.2.

The terms "Pasadena" and "Huntington Beach" were used to capture records that refer to the location of the trip but that do not specifically mention the football game. *Id.* at ¶ 10.

**PLAINTIFF'S RESPONSE:** Undisputed that these search terms would locate *some* records responsive to Mr. Surgey's FOIA request, particularly records concerning the 2018 Rose Bowl game. Disputed that these search terms would locate *all* records responsive to Mr. Surgey's FOIA request as Mr. Surgey's FOIA request was not limited to records concerning the Rose Bowl. Surgey Decl. ¶ 3; EPA Ex. A at 2. Disputed further that location search terms used would capture records that refer to *all* locations of the trip as news reports and other publicly available information have revealed that Mr. Pruitt's trip to California included at least one additional, specific destination beyond the Rose Bowl: Disneyland. Surgey Decl. ¶ 4.

10. One of the Administrator's three Microsoft Outlook accounts was searched with the term "sooner*." This is because the e-mail address of the account was sooners7@epa.gov, and the term "sooner*" would have collected nearly every item in the inbox. The other search terms and the collection from additional custodians should have reasonably captured any responsive records, even without the "sooner*" term. *Id.* at ¶ 11.

**PLAINTIFF'S RESPONSE:** Disputed that "[t]he other search terms and the collection from additional custodians should have reasonably captured any responsive records, even without the "sooner*" term. The search terms utilized were limited to those that would identify responsive records concerning the 2018 Rose Bowl game, but Mr. Surgey's FOIA request was not limited to records concerning the Rose Bowl. Surgey Decl. ¶ 3; EPA Ex. A at 2. Mr. Surgey's FOIA request also requested records containing "[d]etails of who paid for travel, Rose Bowl tickets, and any other associated costs incurred on this trip," and

EPA's search did not include either the EPA's Office or records in the possession of Mr. Pruitt's then-Chief of Staff Ryan Jackson. Surgey Decl. ¶ 5. Mr. Surgey's FOIA request also requested records concerning travel by Mr. Pruitt and "any other EPA staff (including security staff)" on this trip, *id.* ¶ 3; EPA Ex. A at 2, and EPA's search for travel vouchers was limited to Mr. Pruitt and members of the PSD, White Decl. ¶¶ 13–15.

11. Additionally, in early 2018, a small number of emails from the Administrator's personal email accounts were moved into EPA's system. None of the emails were responsive to Plaintiff's request. *Id.* at 12.

    **PLAINTIFF'S RESPONSE:** Disputed to the extent that EPA's statement is predicated on the legal conclusion that EPA properly interpreted the scope of Mr. Surgey's FOIA request, which Mr. Surgey disputes as a matter of law. *See* Mem. in Supp. of Pl. Cross-Mot. for Summ. J. 4–8.

12. An attorney from EPA's Office of the General Counsel ("OGC") contacted the Office of the Controller seeking records responsive to this request. The Office of the Controller conducts searches of the Concur travel system, which contains travel vouchers. Travel vouchers are records which contain an accounting of expenses associated with official EPA travel. *Id.* at ¶ 13.

    **PLAINTIFF'S RESPONSE:** Undisputed.

13. The Office of the Controller staff completed a search of the Concur system for travel associated with the Administrator. They identified no travel vouchers associated with the Administrator from December 14, 2017, through January 14, 2018. *Id.* at ¶ 14.

    **PLAINTIFF'S RESPONSE:** Undisputed.

14. The Office of the Controller staff also searched for records from the December 14, 2017 through January 14, 2018 time frame for any travel to California by PSD members. The Office of the Controller then identified travel vouchers associated with the Administrator's PSD that were responsive to Plaintiff's FOIA request. *Id.* at ¶ 15.

    **PLAINTIFF'S RESPONSE:** Undisputed.

15. On May 30, 2018, OEX Director Elizabeth White directed Hayley Ford to search the Administrator's non-Microsoft Outlook records for records responsive to this request. She was provided with the language of the request and instructions to search local or shared drives, SharePoint sites, OneDrive, mobile devices, text messages, external drives, and hard copy files. On May 31, 2018, Ford completed the search and identified no responsive records. *Id.* at ¶ 16.

    **PLAINTIFF'S RESPONSE:** Undisputed.

16. To collect additional non-Microsoft Outlook records responsive to this request, written instructions containing search guidance were provided to remaining custodians, and the custodians were asked to search following those instructions. Custodians were provided the language of the request and instructions to search local or shared drives, SharePoint sites, OneDrive, mobile devices, text messages, external drives, and hard copy files. *Id.* at ¶ 17.

    **PLAINTIFF'S RESPONSE:** Undisputed.

17. Each remaining custodian provided a response indicating whether or not they had responsive records. The only non-Microsoft Outlook records collected in response to this search effort were a series of text messages with the subject lines "CA" or "PSD prep for CA" between Millan Hupp and OCEFT staff concerning the scheduling of Administrator

Pruitt's trip to California. As explained, OCEFT staff members were involved for coordinating with the PSD. *Id.* at ¶ 18.

**PLAINTIFF'S RESPONSE:** Undisputed.

18. To capture text messages, Hupp took screenshots using her smartphone. In doing so, she also captured separate records in the same screenshot. These non-responsive message threads had different subject lines concerning international travel arrangements and were clearly not responsive to Plaintiff's request. The only reason these records appear in this FOIA response is because Hupp's screenshot included them, similar to one taking a screenshot of several e-mails displayed on a screen at once. The non-responsive records were redacted with the overlay: "Separate Record. Non-Responsive Text Message Threat." *Id.* at ¶ 29.

**PLAINTIFF'S RESPONSE:** Disputed to the extent that EPA's statement contains a legal conclusion about whether text messages appearing in the same screenshot constitute separate records or a single record for purposes of FOIA. *See Am. Immigration Lawyers Ass'n v. Exec. Office for Immigration Review*, 830 F.3d 667, 677–79 (D.C. Cir. 2016).

19. OGC and OCEFT attorneys reviewed attorneys reviewed the collected records for responsiveness and applicability of FOIA exemptions. White also personally reviewed the redactions. *Id.* at ¶ 19.

**PLAINTIFF'S RESPONSE:** Undisputed.

20. On June 22, 2018, EPA produced 300 pages of responsive records to Plaintiff through counsel. On June 25, 2018, EPA discovered that it had inadvertently disclosed the identity of a Special Agent working on the Administrator's PSD in its production. EPA provided Plaintiff's counsel with an updated production and asked them to delete the previous

records containing the inadvertent release. Plaintiff's counsel confirmed receipt of the June 25, 2018, production on June 26, 2018, and agreed to delete the June 22, 2018, production. *Id.* at ¶ 20.

**PLAINTIFF'S RESPONSE:** Undisputed.

21. On July 6, 2018, EPA produced 90 pages of responsive records with redactions to Plaintiff through counsel. After both productions, EPA withheld approximately 99 records in part and 54 records in full. The records withheld in full include 10 vCard files which exclusively contain the contact information of individual law enforcement officers, one copy of the Joint Special Event Threat Assessment for the 2018 Rose Bowl game, seven PSD weekly scheduling documents, and 36 PSD travel itineraries or vouchers. *Id.* at 21.

**PLAINTIFF'S RESPONSE:** Disputed only insofar as EPA's statement on the number of certain records withheld in full varies from its *Vaughn* Index. EPA's *Vaughn* Index indicates six records were withheld as PSD weekly schedules and thirty-seven records were withheld as PSD travel documents. *Vaughn* Index 1–2 (Doc. 13-5).

Dated: November 9, 2018

Respectfully submitted,

/s/ Patrick D. Llewellyn
Patrick D. Llewellyn (DC Bar No. 1033296)
Michael T. Kirkpatrick (DC Bar No. 486293)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
pllewellyn@citizen.org

*Counsel for Plaintiff*