## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| _____ | ) | |
| NICHOLAS SURGEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 18-cv-00654 (TJK) |
| | ) | |
| ENVIRONMENTAL PROTECTION AGENCY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

### Declaration of Patrick D. Llewellyn

I, Patrick D. Llewellyn, declare that, based on personal knowledge:

1. Attached as Exhibit 1 to my declaration is a true and correct copy of a document found on the U.S. Environmental Protection Agency's (EPA) website from EPA's Office of Inspector General (OIG) and titled "EPA Asserts Statutory Law Enforcement Authority to Protect Its Administrator But Lacks Procedures to Assess Threats and Identify the Proper Level of Protection" (OIG Report). The OIG Report can be found at https://www.epa.gov/sites/production/files/2018-09/documents/_epaoig_20180904-18-p-0239.pdf.

2. Attached as Exhibit 2 to my declaration is a true and correct copy of a document found on the U.S. Government Accountability Office's (GAO) website that is styled as an opinion directed to members of Congress regarding the subject "U.S. Environmental Protection Agency—Installation of Soundproof Privacy Booth" (GAO Report). The GAO Report can be found at https://www.gao.gov/assets/700/691272.pdf.

3. Attached as Exhibit 3 to my declaration is a true and correct copy of a document found on the House of Representatives Committee on Oversight and Government Reform's website that is styled as a letter from Representative Trey Gowdy to EPA Administrator Scott Pruitt dated April 13, 2018. The letter can be found at https://oversight.house.gov/wp-content/uploads/2018/04/2018-04-13-TG-to-Pruitt-EPA-re-Travel-and-TIs-due-4-27.pdf.

4. Attached as Exhibit 4 to my declaration is a true and correct copy of a document found on the House of Representatives Committee on Oversight and Government Reform's website that is styled as a letter from Representative Trey Gowdy to EPA Administrator Scott Pruitt dated April 11, 2018. The letter can be found at https://oversight.house.gov/wp-content/uploads/2018/04/2018-04-11-TG-to-Pruitt-EPA-Travel-Follow-up-due-4-25.pdf.

***

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 9, 2018

Patrick D. Llewellyn

# EXHIBIT 1



U.S. ENVIRONMENTAL PROTECTION AGENCY

## OFFICE OF INSPECTOR GENERAL

*Hotline Report:*
*Operating efficiently and effectively*

# EPA Asserts Statutory Law Enforcement Authority to Protect Its Administrator but Lacks Procedures to Assess Threats and Identify the Proper Level of Protection

**Report No. 18-P-0239**          **September 4, 2018**



**Report Contributors:**   John Trefry
Jean Bloom
Philip J. Cleveland

**Abbreviations**

| | |
|---|---|
| CID | Criminal Investigation Division |
| EPA | U.S. Environmental Protection Agency |
| GAO | U.S. Government Accountability Office |
| IBC | U.S. Department of the Interior's Interior Business Center |
| LEAP | Law Enforcement Availability Pay |
| MARS | Monthly Activity Reporting System |
| OCEFT | Office of Criminal Enforcement, Forensics and Training |
| OCFO | Office of the Chief Financial Officer |
| OECA | Office of Enforcement and Compliance Assurance |
| OGC | Office of General Counsel |
| OIG | Office of Inspector General |
| PSD | Protective Service Detail |
| SA | Special Agent |
| SAC | Special Agent in Charge |
| U.S.C. | United States Code |

**Cover Image:**   The image shows how the PSD incurred over $3.5 million in costs for the 11-month period of February 1, 2017, through December 31, 2017—an increase of over 110 percent compared to the prior 11-month period's costs of $1.6 million.

**re you aware of fraud, waste or abuse in an EPA program?**

**EPA Inspector General Hotline**
1200 Pennsylvania Avenue, NW (2431T)
Washington, DC  20460
(888) 546-8740
(202) 566-2599 (fax)
OIG_Hotline@epa.gov

Learn more about our OIG Hotline.

**EPA Office of Inspector General**
1200 Pennsylvania Avenue, NW (2410T)
Washington, DC  20460
(202) 566-2391
www.epa.gov/oig

Subscribe to our Email Updates
Follow us on Twitter @EPAoig
Send us your Project Suggestions



**U.S. Environmental Protection Agency**
**Office of Inspector General**

18-P-0239
September 4, 2018

# At a Glance

## Why We Did This Audit

The U.S. Environmental Protection Agency (EPA) Office of Inspector General received a hotline complaint that alleged timekeeping irregularities and potential salary cap violations by members of the EPA Administrator's Protective Service Detail (PSD). The PSD provides physical protection and protective escorts to the Administrator. The complaint alleged that PSD agents were not working their complete 8-hour shifts nor their required 2-hour average overtime requirement for Law Enforcement Availability Pay. In addition, the complaint alleged PSD agents may have exceeded the biweekly and/or annual pay cap limitations set by 5 U.S.C. § 5547(a) and (b), *Limitation on Premium Pay*.

We initiated this audit to determine whether the Administrator's PSD has adequate controls for the scheduling, approving and monitoring of employee time. Our internal control assessment expanded the audit to include a review of the agency's law enforcement authority.

**This report addresses the following:**

- *Operating efficiently and effectively.*

**Send all inquiries to our public affairs office at (202) 566-2391 or visit www.epa.gov/oig.**

**Listing of OIG reports.**

### *EPA Asserts Statutory Law Enforcement Authority to Protect Its Administrator but Lacks Procedures to Assess Threats and Identify the Proper Level of Protection*

## What We Found

Without a legal opinion, we could not determine whether PSD agents maintained law enforcement authority to provide protective services for the EPA Administrator. According to the U.S. Government Accountability Office, only two federal agencies—the U.S. Secret Service and the U.S. Department of State—have statutory authority to protect executive branch officials.

> **Failure to properly justify the level of protective services provided to the Administrator has allowed costs to increase from $1.6 million to $3.5 million in just 11 months.**

Many agencies rely on other authorities to provide protection to their officials, such as having their protective personnel deputized by the U.S. Marshals Service. However, a recent EPA Office of General Counsel legal opinion, prepared in response to a recommendation in this report, asserts that the EPA has statutory law enforcement authority for its protective service.

We found that the PSD has no final, approved standard operating procedures that address the level of protection required for the Administrator or how those services are to be provided. The failure to have effective and current standard operating procedures can result in the organization having unclear lines of authority, inconsistent practices, inappropriate or inadequate staffing, and excessive or unnecessary costs. For example, the PSD incurred over $3.5 million in costs from February 1, 2017, through December 31, 2017—an increase of over 110 percent compared to the prior period's costs of $1.6 million—without documented justification.

We also found that PSD agents worked overtime without proper authorization, resulting in improper payments of $106,507 between January 2016 and March 2017. Additionally, the Office of General Counsel incorrectly terminated a debt owed by a PSD agent, resulting in the agent exceeding the annual pay cap.

## Recommendations and Agency Response

We recommend that the Assistant Administrator for Enforcement and Compliance Assurance implement the Office of General Counsel opinion through new policies, procedures and/or guidance that define the amount of time PSD agents must spend on investigating environmental crimes to obtain statutory law enforcement authority and how the time will be monitored and documented by supervisors. Also, we recommend that the EPA complete a threat analysis on a regular basis to identify the proper protection required for the Administrator. Further, we recommend that the EPA create and implement comprehensive policies, procedures and standard operating procedures for all PSD operations. The agency took or agreed to take sufficient corrective actions for four of our 12 recommendations, but the remaining eight remain unresolved.



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

THE INSPECTOR GENERAL

September 4, 2018

<u>**MEMORANDUM**</u>

**SUBJECT:**   EPA Asserts Statutory Law Enforcement Authority to Protect Its Administrator but Lacks Procedures to Assess Threats and Identify the Proper Level of Protection
Report No. 18-P-0239

**FROM:**   Arthur A. Elkins Jr.

**TO:**   Susan Bodine, Assistant Administrator
Office of Enforcement and Compliance Assurance

Holly Greaves, Chief Financial Officer

Matthew Leopold, General Counsel

This is our report on the subject audit conducted by the Office of Inspector General (OIG) of the U.S. Environmental Protection Agency (EPA). The project number for this audit was OA-FY16-0265. This report contains findings that describe the problems the OIG has identified and the corrective actions the OIG recommends. This report represents the opinion of the OIG and does not necessarily represent the final EPA position. Final determinations on matters in this report will be made by EPA managers in accordance with established audit resolution procedures.

**Action Required**

The agency took or provided acceptable corrective actions for Recommendations 1, 2, 9 and 10 of this report, and no further response is required for those recommendations. However, the remaining eight recommendations are unresolved. In accordance with EPA Manual 2750, the resolution process begins immediately with the issuance of the report. We are requesting that the Assistant Administrator for Enforcement and Compliance Assurance, Chief Financial Officer, and General Counsel meet within 30 days with the OIG's Assistant Inspector General for Audit and Evaluation. If resolution is still not reached, the applicable agency office is required to complete and submit a dispute resolution request to the appropriate official to continue resolution.

We will post this report to our website at www.epa.gov/oig.

**EPA Asserts Statutory Law Enforcement**
**Authority to Protect Its Administrator but**
**Lacks Procedures to Assess Threats and**
**Identify the Proper Level of Protection**

18-P-0239

# *Table of Contents*

## Chapters

| | | |
|---|---|---|
| **1** | **Introduction** ................................................................... | 1 |
| | Purpose ........................................................................... | 1 |
| | Background....................................................................... | 1 |
| | Responsible Offices .......................................................... | 3 |
| | Prior Audit Report ............................................................. | 3 |
| | Scope and Methodology .................................................... | 3 |
| | Agency Comments and OIG Evaluation............................... | 4 |
| **2** | **EPA Asserts It Has Statutory Law Enforcement Authority to Protect the EPA Administrator** ........................................... | 5 |
| | Powers of the EPA Under Federal Law .............................. | 5 |
| | Past Agency Efforts to Establish Law Enforcement Authority for PSD........ | 6 |
| | Office of General Counsel Legal Opinion Regarding PSD......... | 7 |
| | Conclusion ...................................................................... | 7 |
| | Recommendations ............................................................ | 8 |
| | Agency Comments and OIG Evaluation............................... | 8 |
| **3** | **PSD Lacks Standard Operating Procedures to Address the Level of Protection Required for the Administrator** ................ | 9 |
| | Standard Operating Procedures.......................................... | 9 |
| | Level of Protection ........................................................... | 10 |
| | GAO and Other Reports Concerning Level of Protection .......... | 11 |
| | Cost of Protective Services Increasing................................. | 12 |
| | Conclusion ...................................................................... | 12 |
| | Recommendations ............................................................ | 13 |
| | Agency Comments and OIG Evaluation............................... | 13 |
| **4** | **Authorization of PSD Overtime Did Not Follow Policy** ........... | 16 |
| | Authorization and Approval of Overtime............................... | 16 |
| | Improper Payments........................................................... | 17 |
| | Conclusion ...................................................................... | 18 |
| | Agency Actions ................................................................ | 18 |
| | Recommendations ............................................................ | 18 |
| | Agency Comments and OIG Evaluation............................... | 19 |

*-continued-*

EPA Asserts Statutory Law Enforcement
Authority to Protect Its Administrator but
Lacks Procedures to Assess Threats and
Identify the Proper Level of Protection

18-P-0239

**5** **PSD Did Not Follow Policy for Recording and Monitoring Law Enforcement Availability Pay Hours**............................................................. **20**

Time-and-Attendance and Management Information Systems................... 20
Policy Not Followed ............................................................. 21
Conclusion ......................................................................... 21
Agency Comments and OIG Evaluation........................................ 21

**6** **Payment Made in Excess of Statutory Pay Limit**............................ **22**

Debt Collection Notice .......................................................... 22
Waiver Determination ........................................................... 23
Management Alert................................................................. 23
Conclusion ......................................................................... 24
Recommendations................................................................. 24
Agency Comments and OIG Evaluation........................................ 25

**Status of Recommendations and Potential Monetary Benefits** ........... **26**

## Appendices

**A** **OGC Legal Opinion Regarding Protective Service Detail** ............................ **28**

**B** **Initial Agency Response to Draft Report** ......................................... **37**

**C** **Agency Response to Revised Recommendations** ......................................... **50**

**D** **Distribution** ........................................................................ **54**

# Chapter 1
## Introduction

## Purpose

As a result of a hotline complaint, the Office of Inspector General (OIG) of the U.S. Environmental Protection Agency (EPA) conducted an audit of the EPA Administrator's Protective Service Detail (PSD). The complaint alleged timekeeping irregularities and potential salary cap violations by agents assigned to the Administrator's PSD. The complaint also alleged that PSD agents were not working their complete 8-hour shifts nor their required 2-hour average overtime requirement for Law Enforcement Availability Pay. In addition, the complaint alleged that PSD agents may be exceeding the biweekly and/or annual pay cap limitations set by law.

The objective of our audit was to determine whether the PSD has adequate controls for the scheduling, approving and monitoring of employees' time. Our internal control assessment expanded the audit to include a review of the agency's law enforcement authority.

## Background

On March 2, 2001, then President George W. Bush issued an order titled *Authorization for Home-To-Work Transportation,* which applied to the EPA Administrator and other federal officials. The order authorized transportation of the EPA Administrator to and from work "in a government vehicle from her residence to her place of employment. …" The authorization was issued under 31 U.S.C. 1344(b)(1)(C) - Public Law 99-950, as amended.

On September 27, 2001, the EPA Administrator delegated responsibility for protective services to the agency's Office of Criminal Enforcement, Forensics and Training (OCEFT), within the Office of Enforcement and Compliance Assurance (OECA). This delegation resulted from an internal EPA meeting held to discuss the ability of the agency's various organizations to provide protective services for the Administrator following the events of September 11, 2001. Prior to 2001, protective service functions had not received significant attention within the EPA.

OCEFT was identified as the organization most capable of providing security for the Administrator because OCEFT had a number of agents who were former members of the U.S. Secret Service, were authorized to carry firearms, and were in a dispersed field structure. This decision resulted in the creation of the PSD. At that time, the core mission of OCEFT was (and remains) the investigation of environmental crimes, and the new PSD activities were generally viewed as ancillary.

In the *Report of the Management Review of the Office of Criminal Enforcement, Forensics and Training* (November 2003), a team led by the Deputy Regional Administrator for Region 4 made recommendations for improvements to OECA. One of the recommendations was that the agency revisit how it implements protective services for the Administrator—specifically, the decision on what level of protection is needed for the Administrator and how to provide that protection. The recommendation stated that the agency should fund OCEFT above and beyond its core mission of criminal environmental investigations, provide adequate training and equipment for those conducting investigations, and make every effort to minimize the effect of protective services on the work of Special Agents investigating environmental cases.

The operating procedures for the Administrator's PSD are outlined in an October 2015 Memorandum of Understanding between the Office of the Administrator and OCEFT. Under this agreement, the Office of the Administrator agrees to provide a copy of the Administrator's schedule and travel plans to the PSD as far in advance as practical for planning purposes and agrees to supplement PSD travel resources as required based on the level of travel required by the Administrator. OCEFT agrees to manage the day-to-day operations and that all law enforcement officers comply with applicable policies and procedures.

As of October 2016, when the PSD was providing Portal-to-Portal (door to door)[1] protection for Administrator McCarthy, it employed six full-time agents, but the Director of OCEFT believed it required eight agents to be fully staffed. Until the Administrator Pruitt's departure in July 2018, the PSD was comprised of 19 agents to provide 24-hour/7-days-a-week protection for the Administrator. See Figure 1.

**Figure 1: PSD staffing comparison (October 2016 and January 2018)**



Source: EPA OIG image.

---

[1] Portal-to-Portal protection relates to transportation of the Administrator to and from work in a government vehicle from their residence to their place of employment.

## Responsible Offices

OCEFT, within OECA, has overall responsibility for the PSD. This includes monitoring the budget and ensuring adequate resources are available as needed. The Office of the Chief Financial Officer (OCFO) maintains a Human Resources and Payroll Customer Service Help Desk that aids with human resources, payroll, and time-and-attendance issues.

## Prior Audit Report

During our audit, we identified an unusual pay adjustment for $23,413 paid to a member of the PSD. As a result, we issued a management alert report on September 27, 2017, *Management Alert: Controls Failed to Prevent Employee from Receiving Payment in Excess of Statutory Limit* (Report No. 17-P-0410). Our purpose was to notify the agency that an internal control weakness resulted in an unauthorized payment to a PSD agent on January 17, 2017. That prior report is currently unresolved. Chapter 6 of this current report, "Payment Made in Excess of Statutory Pay Limit," provides additional details.

## Scope and Methodology

We conducted this audit from September 2016 to May 2018, in accordance with generally accepted government auditing standards issued by the Comptroller General of the United States. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on the audit objective. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions presented in this report.

The OIG's Office of Audit and Evaluation, which conducted this audit, is independent of the OIG's Office of Investigations. The investigators do not participate in audits and have not participated in this audit of the security detail.

To address the hotline allegations and determine whether the PSD had adequate controls for the scheduling, approving and monitoring of employees' time, we performed the following:

- Obtained an understanding of internal controls for PSD time and attendance.

- Compared hours identified in OCEFT's Monthly Activity Reporting System (its management information system) with hours identified in PeoplePlus (the agency's time-and-attendance system).

- Interviewed OCEFT management, PSD agents, and the former Chief of Staff to obtain an understanding on how the PSD services are determined.

- Reviewed regulations and statutes related to the powers of EPA law enforcement officers.

- Obtained cost information related to PSD services.

## Agency Comments and OIG Evaluation

The agency suggested the final report clarify the continued core mission of OCEFT, and modify the report to reflect that the total number of PSD agents is 19. The OIG incorporated the proposed changes.

# Chapter 2
## EPA Asserts It Has Statutory Law Enforcement Authority to Protect the EPA Administrator

In 2000, the U.S. Government Accountability Office (GAO) concluded that only two entities—the U.S. Secret Service and U.S. Department of State—have statutory law enforcement authority to protect executive branch officials. Law enforcement authority may also be obtained through such means as deputation by the U.S. Marshals Service. Without law enforcement authority, protective service personnel in an agency cannot make arrests, conduct investigations and carry a firearm. We could not determine whether the PSD agents maintained law enforcement authority to provide protective services for the EPA Administrator. This occurred because the agency could not provide a documented legal basis for the PSD's law enforcement authority. The agency now asserts, in response to our draft report, that it has statutory law enforcement authority for its protective service.

## Powers of the EPA Under Federal Law

Federal law at 18 U.S.C. § 3063, *Powers of the Environmental Protection Agency,* states, in part:

> Upon designation by the Administrator of the Environmental Protection Agency, any law enforcement officer of the EPA with responsibility for the investigation of criminal violations of a law administered by the Agency may (1) carry firearms; (2) execute and serve any warrant or other processes issued under the authority of the United States; and (3) make arrests without warrant for- (a) any offense against the United States committed in such officer's presence; or (b) any felony offense against the United States if such officer has probable cause to believe that the person to be arrested has committed or is committing that felony offense.

The relationship between 18 U.S.C. § 3063 and PSD agents was detailed in an October 16, 2016, analysis by the OCEFT Legal Counsel Division:

> Newly-hired PSD Agents are designated EPA Special Agents (SA) in the same manner as SAs hired to work in the Criminal Investigation Division (CID), who are clearly covered by 18 U.S.C. § 3063. However, because the duties of PSD Agents do not comport with the plain language of Section 3063 (which confers law enforcement powers on persons "with responsibility for the investigation of criminal violations of a law administered by the EPA"), they are not authorized to carry firearms and

conduct other law enforcement activities pursuant to that statute. Rather, their law enforcement authority to perform protective services stems from their United States Marshals Service deputation.

We compared the agency law enforcement authority identified in 18 U.S.C. § 3063 to U.S. Secret Service and U.S. Department of State statutes that address law enforcement authority to protect senior leadership.[2] For example, law enforcement authority for the U.S. Secret Service, at 18 U.S.C. § 3056, subparts (c)(1)(a) through (c), mirrored the same law enforcement authority as in the EPA's statute, but there was no limitation. EPA law enforcement authority, in 18 U.S.C. § 3063, is limited to investigation of criminal violations of laws administered by the EPA. By contrast, the Secret Service statute states, in part, that the service is authorized to protect the President, his family, former Presidents, presidential candidates and other distinguished foreign visitors, to name a few. No similar language exists in the comparable EPA statute.

## Past Agency Efforts to Establish Law Enforcement Authority for PSD

The function of protecting the Administrator was moved from the OIG to the PSD under "Temporary Amendment to EPA Delegation of Authority 1-6A." The delegation was signed by then EPA Administrator Christine Todd Whitman and dated September 27, 2001.

The progression the agency has gone through since 2001 to provide a basis for law enforcement authority for the PSD is complicated and at times confusing. Initially, OCEFT's SAs were temporarily assigned to the PSD to provide protective services as needed and then rotated back to their normal duties in the CID at the conclusion of details. The agency appears to have taken the position that the law enforcement powers given to the CID agents under 18 U.S.C. § 3063 were automatically transferred to the agents' working in the PSD. There was no agency legal opinion supporting this position.

According to OCEFT, starting in 2010, the PSD agents did not perform work that comported with the statutory authority set out in 18 U.S.C. § 3063. The EPA, therefore, requested U.S. Marshals Service deputation for the PSD agents so that they would be authorized to carry firearms and exercise other law enforcement authority. According to the GAO, U.S. Marshals Service deputation is one method for agencies that lack statutory authority for protection services to obtain the authority to do so. However, the deputation process has its limits. In fact, the GAO opined that agencies that do not have statutory authority for protection services and are relying on the deputation process should instead seek the statutory authority from Congress.

---

[2] See 22 U.S.C. § 2709(a)(3), authorizing Diplomatic Security agents to protect and perform protective functions directly related to maintaining the security and safety of listed officials.

In 2017, the agency stopped using the U.S. Marshals Service's deputation and opted to have the PSD agents either work part of their time in the CID investigating environmental crimes or be permanently assigned to the PSD (with no significant responsibilities for investigating environmental crimes). Following this change, the OIG started questioning OCEFT about the legal basis for the PSD's law enforcement authority.

## Office of General Counsel Legal Opinion Regarding PSD

Starting in February 2017, the OIG requested that OCEFT provide the legal authority allowing the EPA to provide protective services. We were informed that the Office of General Counsel (OGC) and OCEFT resolved the law enforcement authority issue, but the agency—repeatedly—failed to respond to our requests for a written legal opinion that supported its position. The agency asserted that the law enforcement authority of 18 U.S.C. § 3063 is broad and runs to agents working in the PSD. The agency further asserted that a PSD agent without responsibility for investigating environmental crimes can make arrests without warrant for any offense against the United States under the EPA law enforcement authority. However, until it responded to our draft report, the OGC had not provided a written opinion detailing the legal bases for its position. The OGC issued a legal opinion regarding the protective service detail on June 29, 2018 (see Appendix A).

The OGC's legal opinion contends that 18 U.S.C. § 3063—the statute that discusses the law enforcement authority for the EPA law enforcement officers with responsibility for the investigation of criminal violations of a law administered by the EPA—could be extended to the EPA's protective service if the PSD agents also had the responsibility for the investigation of environmental crimes. The OGC interpreted the meaning of Section 3063 to include the extension of statutory law enforcement authority for investigating violations of EPA laws to EPA protective services. The OIG does not take any position on the merits of the OGC analysis.

## Conclusion

We could not determine whether the PSD agents maintained law enforcement authority to provide protective services for the EPA Administrator. For over a year, and after repeated requests by the OIG, the agency failed to provide a legal opinion setting out the legal basis for the PSD's law enforcement authority. The opinion recently provided by the EPA in response to Recommendation 1 below asserts that, with 18 U.S.C § 3063, *Powers of the Environmental Protection Agency*, the EPA has statutory law enforcement authority for its protective service. The production of the opinion by OGC meets the intent of the OIG's request.

## Recommendations

We recommend that the Assistant Administrator for Enforcement and Compliance Assurance:

1. Obtain a formal legal opinion from the EPA's Office of General Counsel that articulates the underlying legal basis for the law enforcement authority of the Protective Service Detail's agents.

2. Implement the Office of General Counsel opinion through new policies, procedures and/or guidance that defines the amount of time agents must spend on investigating environmental crimes and how the time will be monitored and documented by supervisors.

## Agency Comments and OIG Evaluation

The agency provided both a legal opinion (Appendix A) and an initial response (Appendix B) relating to the PSD's law enforcement authority to provide protective services. As a result of the OGC legal opinion, we consider Recommendation 1 to be completed.

The agency's initial response asserted that the OGC legal opinion articulates the underlying legal basis for the authority of the PSD agents, and requested that Chapter 2 be eliminated. The agency additionally contended that several statements in the draft report were incorrect or inaccurate. We modified Chapter 2 to indicate that the statements in question were direct quotations from agency documents. Further, the agency asserts that the OIG ignored the fact that the PSD's current duties include the investigation of environmental crimes. We disagree; we did not ignore it. The addition of environmental crime investigations being added to the PSD agents' scope of work was completed after the OIG informed OCEFT of those requirements.

The OGC legal opinion states that OCEFT must now determine how much time an agent must spend in the CID to transfer the statutory law enforcement authority to the EPA's protective service. We modified Recommendation 2 to address the new requirement. OECA provided comments on the revised recommendations (Appendix C) and concurred with the revised Recommendation 2. The agency indicated the proposed corrective actions will be completed by September 30, 2018. We consider Recommendation 2 resolved with corrective actions pending.

# Chapter 3
## PSD Lacks Standard Operating Procedures to Address the Level of Protection Required for the Administrator

The PSD has no final, approved standard operating procedures that address the level of protection required for the Administrator or how those services are to be provided. The PSD indicated that, due to staff shortages, it has not updated and finalized draft procedures dating back to 2011. The failure to have effective and current standard operating procedures can result in the organization having unclear lines of authority, inconsistent practices, inappropriate or inadequate staffing, and excessive or unnecessary costs. For example, the PSD incurred over $3.5 million in costs from February 1, 2017, through December 31, 2017—an increase of over 110 percent compared to the prior period's costs of $1.6 million—without documented justification.

## Standard Operating Procedures

Law enforcement groups generally establish their policies, procedures and/or standard operating procedures based on their authority to carry out their functions. Policies, procedures and/or standard operating procedures help establish consistent practices in law enforcement and lead to operations being carried out in a consistent manner. For example, OCEFT receives its authority through various environmental statutes—such as the Clean Air Act, Clean Water Act and Safe Drinking Water Act—which establish standards for the areas covered (i.e., clean air, clean water and safe drinking water). From these authorities, the OCEFT develops policies, procedures and standard operating procedures that detail specific activities performed while investigating environmental crimes.

In November 2003, a committee led by the Deputy Regional Administrator for Region 4 issued the *Report of the Management Review of the Office of Criminal Enforcement, Forensics and Training* that identified the lack of formal guidance for the PSD. In November 2011—8 years later—the PSD drafted a document titled *Protective Service Detail Standard Operating Procedures*. This document, which is still in draft, states its mission and purpose is:

> To provide dignitary protection services to the Administrator of the United States Environmental Protection Agency.

> Primary - Safeguard the Administrator from harm and situations likely to endanger his or her person.

PSD officials said that the draft standard operating procedure is out of date, not useful, and currently undergoing revision. Although more than 6 years have passed since the draft document was prepared, PSD management said that due to staff shortages there had not been enough time to update the manual. In response to our work, OCEFT in now in the process of developing policies and procedures for the PSD, and anticipates having the policies and procedures completed by September 2018.

## Level of Protection

The PSD did not conduct a threat analysis (threat assessment, level of any other risks and comfort of the protectee) to determine the increased level of protection necessary or desired for Administrator Pruitt. Rather, the PSD asserted that it used an August 16, 2017, report titled *Summary of Pending and Recent Threat Investigations* requested from the OIG to support the increased level of protection. The OIG report consisted of four parts:

1. Summary and Threat Statistics.
2. Threats Directed Against Administrator Pruitt and/or his family.
3. Threats Directed Against Administrator McCarthy.
4. Threats Directed Against Other EPA Employees.

The information in the OIG summary report only consisted of statistical data of threats received by the OIG. The report included quantitative data regarding the number of threats as well as details of some specific threats. The report did not assess the potential danger presented by any of these threats. This information is considerably narrower in scope and only an element of what would be contained as part of a threat analysis as defined by the U.S. Department of Homeland Security or GAO. The OIG only provided statistics and the OIG's report should not have been used to justify protective services. Additionally, the OIG summary report was prepared almost 6 months after the decision to have PSD provide 24/7 protection to the Administrator (and 6 months after the Administrator came onboard, in March 2017).

The PSD's failure to establish policies, procedures and standard operating procedures related to the level of service it provides can result in the organization not operating effectively, efficiently or consistently. It also leads to ambiguity with respect to how the security detail operates.

The decision to have 24/7 protection for the Administrator was made prior to his arrival without using a threat analysis to determine the proper level of protection required. As a result, the level of service it provided to Administrator Pruitt defaulted to a management decision from the Office of the Administrator. The increased costs associated with this undocumented decision represents an inefficient use of agency resources. On July 13, 2018, the now-acting

Administrator requested that 24-hour/7 day-a-week protection be eliminated and replaced with the Portal-to-Portal.

On April 3, 2018, OCEFT management asserted that OCEFT is performing a "threat assessment" as part of the threat analysis every 90 days for operational purposes. OCEFT said it will be working with other EPA offices and the OIG to determine which office is best positioned to perform threat assessments in the future.

## GAO and Other Reports Concerning Level of Protection

The GAO's *Standardization Issues Regarding Protection of Executive Branch Officials*, dated July 2000, notes that threat assessments form the basis for determining the need and scope of protection. The lack of a thorough threat analysis that documents the justification for the level of protection makes it difficult to determine the basis for, reasonableness of, and appropriate cost for the protective services being provided.

The GAO's report further emphasized the importance placed on threat assessments as part of the analysis. Specifically, it cited an Air Force requirement that detailed, written threat assessments, as part of the analysis, be prepared regarding its protected officials. The assessment should be the initial element of any protective operation and form the basis for determining the need and scope of a formal protective service operation.

The U.S. Department of Homeland Security Risk Steering Committee's *DHS Risk Lexicon*, dated September 2008, defines a threat assessment as a "process of identifying or evaluating entities, actions, or occurrences, whether natural or man-made, that have or indicate the potential to harm life, information, operations and/or property."

The U.S. Department of Justice, in its September 2005 report *Assessing and Managing the Terrorism Threat*, states:

> The intelligence process is the foundation of threat assessment. ... Threat assessments must be compiled from comprehensive and rigorous research and analysis. Law enforcement cannot function unilaterally. Threat assessments that do not incorporate the knowledge, assessments, and understanding of state, local, and private organizations and agencies with the potential threats being assessed are inherently incomplete. (emphasis added).

Additionally, the report notes that the "threat assessment should also assimilate germane, open-source, or nonproprietary threat assessments, as well as intelligence information." The report also identifies essential data that should be collected prior to performing the assessment.

## Cost of Protective Services Increasing

We compared the total cost of the PSD under Administrator Pruitt for the
11-month period of February 1, 2017, through December 31, 2017, to the cost
incurred under Administrator McCarthy for her last 11-month period—between
March 1, 2016, and January 31, 2017. We found that total costs of the PSD more
than doubled from the costs incurred under Administrator McCarthy, as shown in
Table 1 and Figure 2. These increases were due primarily to the new
24-hour/7-day-a-week protection required by the Office of the Administrator and
increased costs to travel first class.

**Table 1: PSD cost comparisons for Administrators**

| Cost element | 3/1/16–1/31/17 | 2/1/17–12/31/17 | % increase |
|---|---|---|---|
| Payroll | $1,208,798 | $2,330,502 | 92.8% |
| Travel | 233,887 | 739,580 | 216.2 |
| Other Direct Costs* | 224,771 | 445,857 | 98.4 |
| **Total** | **$1,667,455** | **$3,515,940** | **110.8%** |

Source: OCEFT resource management staff.

*Other Direct Costs include associated expenses, contracts costs, and working capital fund
expenses.

**Figure 2: PSD cost comparison for Administrators**



Source: EPA OIG image.

## Conclusion

The PSD lacks policies, procedures and standard operating procedures for the
operational and administrative functions it performs. Further, the services that the
PSD provides to the Administrator are based on management decisions rather

than being supported by a threat analysis. As a result, the costs of providing increased security services to Administrator Pruitt have more than doubled compared to the costs of services provided to Administrator McCarthy. OCEFT has expressed a commitment to prepare policies and procedures and perform regularly scheduled threat analysis.

## Recommendations

We recommend that the Assistant Administrator for Enforcement and Compliance Assurance:

3. Have the Office of Criminal Enforcement, Forensics and Training complete and document a threat analysis for the EPA Administrator on a regular basis to justify the proper level of protection required for the Administrator.

4. Using a justified level of protection based on a threat analysis, determine appropriate staffing and corresponding schedules for Protective Service Detail agents.

5. Create and implement comprehensive policies, procedures and standard operating procedures covering the Protective Service Detail operations and proper protection level determinations.

## Agency Comments and OIG Evaluation

In its initial response (Appendix B), the agency stated that while a threat assessment is a useful tool, it is just one tool. We agree. We modified the report to address a threat assessment as being part of the overall threat analysis to determine the level of protection for an Administrator, as well as the level of any other risks and comfort of the protectee. Chapter 3 was revised to use the term threat analysis, which would encompass threat assessments, other risks, and the protectee concerns to document and justify the level of protection required for the Administrator.

The agency asserted that the PSD does not conduct or use a threat assessment to determine the level of protection to provide the EPA Administrator. Rather, the level of protection is an administrative decision, informed by awareness of risks and the potential impact of those risks to the efficient functioning of the agency. In February 2017, the PSD was directed by the transition team to provide 24/7 protection to the Administrator, consistent with the level of protection provided some other cabinet officials, and began to do so immediately upon his arrival. The decision to provide 24/7 protection to the Administrator was to be reevaluated after an initial 2-week period.

With respect to the decision to provide 24/7 protection for Administrator Pruitt, we requested documents from OCEFT to support this decision. On multiple

occasions for more than a year, we were informed by OCEFT officials that there was no documentation to support these decisions. As part of the documents provided on June 1, 2018, by the Office of the Administrator, there were discussions as far back as February 2017, when the 24/7 detail was discussed with OCEFT. Numerous emails were provided that included OCEFT employees who earlier stated no documentation existed.

Although the PSD was directed to provide 24/7 protection in February 2017, the agency was aware that such protection needed to be justified. Prior to Administrator Pruitt's coming on board, officials from the Office of the Administrator, OECA, OCEFT and Office of Homeland Security were planning for the 24/7 protection requirement. Collectively these groups were assessing:

1. The history and extent of protection services provided to prior Administrators.
2. A comparison of threat levels.
3. The amount of funding that would be required to provide 24/7 protection.
4. The source of funding for OECA and OCEFT.
5. Long-term fixes necessary if a decision is made to provide 24/7 protection long term.

During Administrator Pruitt's initial 2-week period, a cost analysis and a threat assessment was to be prepared by OCEFT, PSD and Office of Homeland Security to help in the protection reevaluation decision. We found evidence of a cost analysis prepared for the decision meeting, but no threat analysis or documented decision to continue 24/7 protection. We note that on several occasions OCEFT requested information about the assessment of threats from the Office of Homeland Security, and that office did not identify any specific threats against Administrator Pruitt based upon historical information. We have not received any documented evidence or justification supporting the decision to continue to provide 24/7 protective services.

Recommendations 3 and 4 were adjusted to replace the term *threat assessment* with *threat analysis*, and the term *identify* was changed to *justify*. In its revised response (Appendix C), the agency did not concur with revised Recommendations 3 and 4. The agency asserts that while a threat analysis is informative, it is not dispositive of a decision to provide protection nor what level of protection should be provided. Further, it asserts that the lack of threats does not mean there is no risk or that protective services are not justified. The agency proposed different recommendations and corrective actions to replace revised Recommendations 3 and 4.

We disagree with the agency's proposed recommendations and corrective actions as they do not meet the intent of our revised recommendations. The OECA is now proposing to conduct threat analyses only twice a year while previously stating it would do so every 90 days. The threat assessment should be conducted as one of

the inputs to the threat analysis. Further, the threat analysis should be used to document and justify the level of protective services to be provided. Additionally, the agency's proposed corrective actions do not require the decisions related to the level of protection provided to the Administrator be documented.

We consider Recommendations 3 and 4 to be unresolved.

Regarding Recommendation 5, the agency agreed in part. OCEFT is in the process of updating its standard operating procedures specific to protective services and plans to finalize them by September 30, 2018. However, its response does not cover standard operating procedures related to determining the proper level of protection for the Administrator. Therefore, we consider Recommendation 5 to be unresolved with implementation efforts in progress.

# Chapter 4
## Authorization of PSD Overtime Did Not Follow Policy

OCEFT did not provide proper authorization of overtime requests for agents assigned to the Administrator's PSD. The requests were authorized by an acting Special Agent in Charge (SAC), but that did not meet the level of approval required in the EPA's *Pay Administration Manual*. The OIG identified $106,507 of overtime payments made without the proper level of authorization. This occurred because OCEFT was not aware of the requirements for the higher level of authorization. OCEFT has since acknowledged the error and made corrections in its authorization process.

## Authorization and Approval of Overtime

We reviewed EPA Form 2560-7, *Request for Overtime Authorization*, for agents authorized to perform work for the PSD during September 2016. We found that all overtime authorization forms were prepared by the acting SAC, in advance, based on requirements of the Administrator's travel schedule. The acting SAC also approved the overtime authorizations for each agent, while the OCEFT Deputy Director approved overtime authorizations requested by the acting SAC. The acting SAC was also responsible for approving overtime charges in PeoplePlus. Details are in Table 2.

**Table 2: Overtime/compensatory time requests**

| Week ending | Overtime request forms submitted | Agents requesting overtime* | Approved by acting SAC? |
|---|---|---|---|
| 09/10/16 | 3 | 5 | Yes |
| 09/17/16 | 4 | 8 | Yes |
| 09/24/16 | 3 | 5 | Yes |
| 10/01/16 | 3 | 9 | Yes |

Source: OIG analysis of agency data.

   * Individual forms were not submitted by each agent.

The requirements for authorization and approval of overtime are in the *EPA Pay Administration Manual*, Chapter 4, Section 6 (May 17, 1990), "Authority to Authorize Overtime and Holiday Work," which states:

> The Administrator, Deputy Administrator, Associate Administrators, Assistant Administrators, the Inspector General, the General Counsel, Deputy General Counsels, Regional Counsels, Regional Administrators, office directors, directors of headquarters staff offices or field equivalents, laboratory directors, Headquarters division directors, and regional division directors are authorized to approve overtime and holiday work and to establish work schedules for compensable pre-shift and work-shift activities

in accordance with governing laws, regulations and Agency rules
and procedures. This authority may be re-delegated to a level that
will assure compliance with legal and regulatory requirements. …

Additionally, OCEFT Policy P-02, *Premium Pay for OCEFT GS-1811 Criminal
Investigators,* Section 3.2(b)(iv), states:

> EPA permits office directors and division directors to approve
> overtime work, and allows re-delegation of this authority.
> OCEFT has re-delegated the authority to assign regularly
> scheduled overtime work, compensable by overtime premium
> pay, to the assistant division director level.

Based on OCEFT policy, the acting SAC is not at the Assistant Division Director
level and thus was not authorized to approve overtime requests. OCEFT officials
acknowledged they were unaware of the requirements and implemented
immediate corrective action to have all future requests authorized by the Deputy
Director. Our review of requests made between February 26 through April 22,
2017, showed that either the OCEFT Director or Deputy Director authorized all
overtime requests.

## Improper Payments

As a result of these improper authorizations, PSD agents incurred unauthorized
overtime costs. As shown in Table 3, PSD agents received an estimated $106,507
in overtime payments for the period January 1, 2016, through March 4, 2017.[3]

**Table 3: Estimated overtime payments**

| Period covered (calendar year) | Overtime costs |
|---|---|
| 2016 (through 12/24/16) | $95,500 |
| 2017 (12/25/16–03/04/17) | 11,007 |
| **Total costs** | **$106,507** |

Source: OIG analysis of agency data.



The OIG considers the overtime payments
resulting from the improper authorizations to be
improper payments as defined by Office of Management and Budget Circular A-123,
Appendix C, *Requirements for Effective Measurement and Remediation of Improper
Payments;* and the Improper Payments Elimination and Recovery Improvement Act
of 2012. Appendix C of the circular defines an improper payment as:

> any payment that should not have been made or that was made in
> an incorrect amount under statutory, contractual, administrative, or

---

[3] We did not determine the extent of improper authorization or any costs associated prior to the period and costs
presented in Table 3.

other legally applicable requirements. Incorrect amounts are overpayments or underpayments that are made to eligible recipients.

Additionally, the term payment is further defined to mean:

> any disbursement or transfer of Federal funds (including a commitment for future payment, such as cash, securities, loans, loan guarantees, and insurance subsidies) to any non-Federal person, non-Federal entity, or Federal employee, that is made by a Federal agency. ...

Under the Improper Payments Elimination and Recovery Improvement Act of 2012, the definition of an improper payment was amended to include payments made to federal employees.

## Conclusion

PSD agents worked overtime without proper authorization, resulting in improper payments of $106,507 between January 2016 and March 2017. There is no requirement to recover these overtime payments solely because the payments were improperly approved; the PSD agents did work the overtime hours. We could not determine the total amount of improperly authorized overtime worked or the period of time the improper authorizations occurred because the issue predates the period of time covered by the audit.

## Agency Actions

Based on our discussion with the agency, OCEFT took immediate action to have the Deputy Director approve all requests for overtime. As a result, no recommendation is being made regarding the authorization of overtime.

## Recommendations

We recommend that the Assistant Administrator for Enforcement and Compliance Assurance require that the Office of Criminal Enforcement, Forensics and Training:

6. Determine the amount of overtime that was improperly authorized for Protective Service Detail agents in calendar years 2016 and 2017 and identify the amounts paid as improper payments.

7. Report improper payments to Protective Service Detail agents to the Office of the Chief Financial Officer for inclusion in the annual Agency Financial Report.

## Agency Comments and OIG Evaluation

The agency suggested the final report clarify that the overtime payments made to the PSD agents did not need to be recovered solely because they were improper payments. The OIG incorporated the proposed change.

The agency disagreed with our recommendations. Although the agency agreed that the pre-approval of overtime was improper, it does not believe the payments resulting from the pre-approval were improper payments. While the agency identified the proper criteria, its analysis does not appear to consider the full scope of the criteria. Specifically, under the Improper Payments Elimination and Recovery Improvement Act of 2012, the definition of an improper payment was amended to include payments made to federal employees. Therefore, Recommendations 6 and 7 remain unresolved.

The full agency response is in Appendix B.

# Chapter 5
## PSD Did Not Follow Policy for Recording and Monitoring Law Enforcement Availability Pay Hours

Administrator Pruitt had required around-the-clock protection, which resulted in PSD agents having complex work schedules with large amounts of overtime, weekend work, shift differentials and Law Enforcement Availability Pay (LEAP) hours. However, PSD agents and their supervisors did not adequately follow policies and procedures for recording and monitoring LEAP hours worked. Failing to follow all applicable policies and procedures increases the risk for fraud, waste and abuse.

## Time-and-Attendance and Management Information Systems

On a biweekly basis, PSD agents are responsible for accurately entering hours worked and leave taken into an electronic timesheet within PeoplePlus—the EPA's time-and-attendance system. Agents attest to the accuracy of the data they enter, and approving officials review and certify to the accuracy of the data. The certified data is then sent to the OCFO's Office of Technology Solutions for processing and transmittal to the agency's payroll provider—the U.S. Department of the Interior's Interior Business Center (IBC).

PSD agents, in accordance with 5 U.S.C. § 5545a, *Availability Pay for Criminal Investigators*, are provided premium pay or LEAP for being available for unscheduled duty. LEAP pay is premium pay that is paid to federal law enforcement officers who are criminal investigators. To qualify for LEAP pay, an agent must work, or be available to work, an average of 2 additional hours for each workday.

PeoplePlus is not used to record agents' LEAP hours. Rather, PSD agents are responsible for submitting their overtime, leave and LEAP hours into the Monthly Activity Reporting System (MARS)—OCEFT's internal management information system—by the tenth workday of the following month. MARS is not a time-and-attendance system; it is a separate stand-alone system that does not integrate with PeoplePlus. MARS is considered a management tool. All supervisors are responsible for reviewing and approving entries in MARS for their agents by the end of the month in which they were submitted. This information is used to demonstrate whether the agents are meeting their 2-hour-per-day availability pay requirements. Agents receiving LEAP must make an annual certification that they have met, and are expected to meet, the average 2-hour-per-day availability requirement. This certification must be approved by the investigator's supervisor and be supported by the information in MARS.

## Policy Not Followed

We found that PSD agents and supervisors complied with policies and procedures for scheduling employee time. However, we found that PSD agents and supervisors did not follow existing policies and procedures for recording and monitoring LEAP hours in MARS. Examples of internal controls not being followed included the following:

- Our review of individual agents' MARS entries found that the reports were not completed in a timely manner. We selected 1 month to review and determined that five of six reports were submitted more than a month late. Further, our review of the sampled MARS reports for the same period found that none were approved by management. PSD agents said MARS reports were not done timely because they were busy doing protective duties rather than timekeeping responsibilities—an administrative burden.

- We were informed that PSD agents use PeoplePlus as the starting point for the data inserted into MARS. Despite this, we could not reconcile information in PeoplePlus to the information in MARS. Our analysis found that five of 14 agents who charged hours to the PSD had hours reported in MARS that did not agree with the hours reported in PeoplePlus.

## Conclusion

Discrepancies were found between the information in MARS and PeoplePlus. We found that MARS information was not entered timely nor reviewed by supervisors in a timely manner These deficiencies can be attributed to agents' lack of awareness of MARS responsibilities, and an opinion that compliance with timekeeping responsibilities was an administrative burden and not of sufficient priority.

We initiated a separate audit of OCEFT's LEAP pay recording due to the issues identified; therefore, no recommendations are being made in this report.

## Agency Comments and OIG Evaluation

The agency's formal response did not include any comments related to Chapter 5. Our final report includes some minor edits as a result of our ongoing OCEFT LEAP audit.

# Chapter 6
## Payment Made in Excess of Statutory Pay Limit

A PSD agent received a $21,449 before-taxes payment in January 2017 for overtime that exceeded the annual pay cap of the prior calendar year. Neither the agency nor its payroll provider initially recognized that the payment resulted in the employee exceeding the 2016 annual pay cap because the overtime hours were worked and recorded in 2016 but not processed and paid until January 2017. The OCFO began coordination on the accuracy of the original payment with IBC in March 2017, and a debt collection notice was issued to the agent on July 14, 2017. We issued a management alert report on September 27, 2017, *Management Alert: Controls Failed to Prevent Employee from Receiving Payment in Excess of Statutory Limit* (Report No. 17-P-0410), to notify the agency of the internal control weakness that resulted in an unauthorized payment.

## Debt Collection Notice

On July 14, 2017, the IBC—the EPA's payroll provider—sent a Bill for Collection to the subject PSD agent informing him that he may have received an excess federal salary payment of $16,299.33 after taxes. IBC stated that the reason for the overpayment was "an erroneous overpayment/credit," and requested either payment in full by August 13, 2017, or other repayment options. Starting on July 19, 2017, the PSD agent began filing a formal debt collection waiver request, which stated in part:

> I do not believe that this was an erroneous overpayment/credit. It was payment for hours properly preapproved, scheduled, and worked. There was, and still to this day is, enough confusion by many people … to be able to say that no one really knows at this point if this was truly an erroneous payment. Therefore, I respectfully request that this waiver request be granted and this matter is allowed to be put behind me. …

According to the IBC, in July 2017, at the EPA's request, a manual adjustment was made to remove the $16,299.33 salary payment from the gross wages of the PSD agent because the amount was in dispute. This prevented the $16,299.33 payment in question from counting toward the annual pay cap. In addition, the perceived temporary manual adjustment was only intended to remain in place until the agency ruled on the waiver request. Consequently, the agent was not required to make any payments against this debt until a final determination was made.

## Waiver Determination

On November 1, 2017, the EPA's OGC denied the agent's waiver request. The OGC stated, in part, that after an audit was performed, it was determined by both the IBC and OCFO that the annual pay cap cannot legally be exceeded and may not roll over into the following calendar year. An employee forfeits any additional compensation once he or she hits that year's pay ceiling. Further, the waiver was precluded since the employee was aware that he or she was being overpaid.

After the waiver was denied, the OCEFT Deputy Director and OCFO officials provided the OGC additional information about the debt collection. The OGC was informed that the PSD agent was a criminal investigator earning a base pay of $136,160, and that his 25 percent LEAP differential would raise his annual salary to over $170,200—clearly above the annual pay limit of $161,900. Without receiving the January 2017 lump sum payment, the agent's pay would already be reduced to prevent the agent from exceeding the 2017 annual limit. The OCFO further concluded that the lump sum payment the agent received in January 2017 would count toward the annual limit of $161,900 and the controls in place would prevent payments above the annual limit. Based on this information, the OGC determined that the cost of further collection was likely to exceed the amount recoverable and consequently the debt was terminated. The OCFO was instructed to work with the IBC to close out this debt.

However, we found the information presented to the OGC by OCEFT and OFCO was incorrect. The OGC was not informed that the disputed payment of $16,299.33 was manually adjusted and removed from being considered part of the gross wages of the PSD agent. The OGC was also not informed that the manual adjustment caused repayments to be deferred until a final determination was made on the waiver. As a result, the lump sum payment was not included in the calculation of the 2017 annual pay limit, and the PSD agent exceeded the annual pay cap of $161,900.

## Management Alert

Our management alert report—issued September 27, 2017—had recommended the following to the EPA Chief Financial Officer:

1. Design and implement new controls to prevent the reoccurrence of unauthorized payments that will put an employee above the annual statutory pay cap.

2. Determine whether similar unauthorized payments above the annual statutory pay cap have been made to other EPA employees.

3. Recover any overpayments above the annual statutory pay cap.

OCFO indicated that it agreed with the recommendations and submitted planned corrective actions and revised corrective actions to resolve the management alert's findings on three separate occasions (November 6, 2017; January 17, 2018; and May 17, 2018). However, we found the actions to be incomplete based on the information provided. In June 2018, the OCFO was able to demonstrate that the new controls implemented would prevent future instances of an employee overpayment. However, the OIG maintains that:

1. The OCFO did not provide the scope of its analysis to demonstrate how it could conclude that there were no additional overpayments beyond those identified.

2. The agency has not provided documentation to support the OGC basis for termination of the debt nor that the debt was recouped to prevent exceeding the annual pay cap in calendar year 2017.

## Conclusion

The OGC incorrectly terminated a debt owed by a PSD agent because OGC was not informed that the earlier decisions to suspend debt payments removed the lump sum payments from the calculation of the annual pay cap.

## Recommendations

We recommend that the General Counsel:

8. Revisit the Office of General Counsel's decision to terminate the debt collection associated with the Protective Service Detail agent who had received the $16,299.33 overpayment.

We recommend that the Chief Financial Officer:

9. Request a pay audit of the calendar year 2017 wages for the Protective Service Detail agent who had received the overpayment and determine the amount the agent exceeded the 2017 pay cap.

10. Recover the $16,299.33 for which the waiver for the Protective Service Detail agent who had received the overpayment was denied and any additional overpayment determined by the pay audit.

11. Design and implement new controls to prevent the reoccurrence of unauthorized payments that will put an employee above the annual statutory pay cap.

12. Determine whether similar unauthorized payments above the annual statutory pay cap have been made to other EPA employees in calendar years 2016 and 2017, and recover any overpayments as appropriate.

# Agency Comments and OIG Evaluation

The agency suggested edits to be made to the final report to better summarize and clarify Chapter 6. The OIG incorporated the proposed changes as appropriate.

For Recommendation 8, we verified that on June 4, 2018, the acting EPA Claims Officer reopened the waiver decision that contained the debt termination decision. The waiver decision was appropriate and should stand for reasons previously provided. Only the decision to terminate the debt should be revisited. We have not received a final waiver decision reversing the debt termination, and no estimated date for completion of corrective actions was provided. Therefore, this recommendation is unresolved.

For Recommendation 9, the agency agreed and requested the IBC to complete a pay audit on the subject PSD agent. The agency estimated corrective actions will be completed by September 30, 2018. We consider this recommendation resolved with corrective actions pending.

For Recommendation 10, the agency agreed and indicated it will collect any debts upon completion of the OGC review and IBC pay audit. The agency estimated corrective actions will be completed by September 30, 2018. We consider this recommendation resolved with corrective actions pending.

For Recommendation 11, the agency agreed and has strengthened controls with the IBC to help prevent reoccurrence of the problem noted. However, the actions taken to date do not eliminate the removal of salary payments from the annual pay cap calculation when the amount is subject to waiver. Therefore, this recommendation is unresolved.

For Recommendation 12, the agency agreed with our recommendation and provided an analysis of unauthorized payments made in calendar years 2016 and 2017. However, the agency has not indicated how it intends to determine and recover any overpayments as appropriate and the date when the recovery will be completed. Therefore, this recommendation is unresolved.

The full agency response is in Appendix B.

# Status of Recommendations and Potential Monetary Benefits

### RECOMMENDATIONS

| Rec. No. | Page No. | Subject | Status[1] | Action Official | Planned Completion Date | Potential Monetary Benefits (in $000s) |
|---|---|---|---|---|---|---|
| 1 | 8 | Obtain a formal legal opinion from the EPA's Office of General Counsel that articulates the underlying legal basis for the law enforcement authority of the Protective Service Detail's agents. | C | Assistant Administrator for Enforcement and Compliance Assurance | 6/29/18 | |
| 2 | 8 | Implement the Office of General Counsel opinion through new policies, procedures and/or guidance that defines the amount of time agents must spend on investigating environmental crimes and how the time will be monitored and documented by supervisors. | R | Assistant Administrator for Enforcement and Compliance Assurance | 9/30/18 | |
| 3 | 13 | Have the Office of Criminal Enforcement, Forensics and Training complete and document a threat analysis for the EPA Administrator on a regular basis to justify the proper level of protection required for the Administrator. | U | Assistant Administrator for Enforcement and Compliance Assurance | | |
| 4 | 13 | Using a justified level of protection based on a threat analysis, determine appropriate staffing and corresponding schedules for Protective Service Detail agents. | U | Assistant Administrator for Enforcement and Compliance Assurance | | |
| 5 | 13 | Create and implement comprehensive policies, procedures and standard operating procedures covering the Protective Service Detail operations and proper protection level determinations. | U | Assistant Administrator for Enforcement and Compliance Assurance | | |
| 6 | 18 | Require that the Office of Criminal Enforcement, Forensics and Training determine the amount of overtime that was improperly authorized for Protective Service Detail agents in calendar years 2016 and 2017 and identify the amounts paid as improper payments. | U | Assistant Administrator for Enforcement and Compliance Assurance | | $106.5 |
| 7 | 18 | Require that the Office of Criminal Enforcement, Forensics and Training report improper payments to Protective Service Detail agents to the Office of the Chief Financial Officer for inclusion in the annual Agency Financial Report. | U | Assistant Administrator for Enforcement and Compliance Assurance | | |
| 8 | 24 | Revisit the Office of General Counsel's decision to terminate the debt collection associated with the Protective Service Detail agent who had received the $16,299.33 overpayment. | U | General Counsel | | |
| 9 | 24 | Request a pay audit of the calendar year 2017 wages for the Protective Service Detail agent who had received the overpayment and determine the amount the agent exceeded the 2017 pay cap. | R | Chief Financial Officer | 9/30/18 | |
| 10 | 24 | Recover the $16,299.33 for which the waiver for the Protective Service Detail agent who had received the overpayment was denied and any additional overpayment determined by the pay audit. | R | Chief Financial Officer | 9/30/18 | |
| 11 | 24 | Design and implement new controls to prevent the reoccurrence of unauthorized payments that will put an employee above the annual statutory pay cap. | U | Chief Financial Officer | | |

**RECOMMENDATIONS**

| Rec. No. | Page No. | Subject | Status[1] | Action Official | Planned Completion Date | Potential Monetary Benefits (in $000s) |
|---|---|---|---|---|---|---|
| 12 | 24 | Determine whether similar unauthorized payments above the annual statutory pay cap have been made to other EPA employees in calendar years 2016 and 2017, and recover any overpayments as appropriate. | U | Chief Financial Officer | | |

[1] C = Corrective action completed.
  R = Recommendation resolved with corrective action pending.
  U = Recommendation unresolved with resolution efforts in progress.

**Appendix A**

# *OGC Legal Opinion Regarding Protective Service Detail*



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
Washington, D.C. 20460

JUN 2 9 2018

OFFICE OF
GENERAL COUNSEL

**MEMORANDUM**

**SUBJECT**:   Legal Opinion Regarding Protective Service Detail

**FROM:**      Wendy L. Blake, Associate General Counsel   *WLB*
General Law Office
Office of General Counsel

**THRU:**      Kevin S. Minoli, Principal Deputy General Counsel   *KSM.*
Office of General Counsel

**THRU:**      Matthew Z. Leopold, General Counsel
Office of General Counsel

**TO:**         Henry E. Barnet, Director
Office of Criminal Enforcement, Forensics & Training

The Office of General Counsel has been asked to opine on (1) the source of the Agency's legal authority to provide protective services for the Administrator, and (2) the basis of the protective service agents' authority to carry firearms, execute warrants, and make arrests, otherwise known as "law enforcement authority," while in the performance of their protective services duties. The Agency has authority to expend appropriated funds to provide protective services for the Administrator under 5 U.S.C. § 301. Further, the protective service agents derive law enforcement authority under 18 U.S.C. § 3063 provided they have responsibility for investigating environmental crimes. Together, these statutes authorize the Agency to provide a protective service detail to the Administrator comprised of protective service agents with full law enforcement authority to carry firearms, execute warrants, and make arrests.

## Background

The U.S. Environmental Protection Agency employs a Protective Service Detail ("PSD")
staffed by agents responsible for providing personal protective services to the Agency's
Administrator.[1] The PSD is a separate component of the Criminal Investigation Division ("CID")
in the Office of Criminal Enforcement, Forensics, and Training ("OCEFT"), Office of
Enforcement and Compliance Assurance. Across the federal government, federal law enforcement
personnel such as PSD agents must possess authority to exercise law enforcement functions
including carrying firearms, executing warrants, and making arrests. For instance, the criminal
investigators in CID who conduct investigations of environmental crimes, derive their law
enforcement authority from 18 U.S.C. § 3063, "Powers of the Environmental Protection Agency,"
which states, in part:

> Upon designation by the Administrator of the Environmental Protection Agency,
> any law enforcement officer of the Environmental Protection Agency with
> responsibility for the investigation of criminal violations of a law administered by
> the Environmental Protection Agency, may—
>> (1) carry firearms;
>> (2) execute and serve any warrant or other processes issued under the authority of
>> the United States; and
>> (3) make arrests without warrant for-
>>> (A) any offense against the United States committed in such officer's
>>> presence; or
>>> (B) any felony offense against the United States if such officer has probable
>>> cause to believe that the person to be arrested has committed or is committing
>>> that felony offense.

This statute provides full law enforcement authority to carry firearms, execute warrants, and make
arrests. This authority is broad, allowing CID criminal investigators to carry firearms and make
arrests without warrants for offenses against the United States committed in their presence (or if

---

[1] Currently all PSD agents are classified as Criminal Investigators, GS-1811.

2

they have probable cause to believe that someone has committed or is committing a felony), even at times when they are not actively investigating environmental crimes.

We understand from OCEFT that when CID criminal investigators assigned to the PSD first undertook the performance of protective services in the wake of the September 11, 2001 terrorist attacks, they possessed law enforcement authority related to their criminal investigative work conferred by 18 U.S.C. § 3063. Nearly a decade later, the PSD began to employ law enforcement officers hired from outside the Agency who were not envisioned to have "responsibility for the investigation of criminal violations" of environmental laws — the prerequisite for § 3063 authority. OCEFT consulted with the Office of General Counsel ("OGC") about this issue, and in 2010 obtained law enforcement authority for PSD agents through deputation by the U.S. Marshals Service. These deputations granted PSD agents law enforcement authority for a set period of time (as specified in the deputations). In the fall of 2016, OCEFT again consulted with OGC regarding transitioning PSD agents' law enforcement authority back to 18 U.S.C. § 3063. OGC concurred with OCEFT's view that PSD agents with actual "responsibility for the investigation of criminal violations" may appropriately rely on § 3063 for law enforcement authority.

## Analysis

A. The Agency Has Authority to Expend Appropriated Funds on Protective Services

It is well established that the Agency has the authority to expend resources for the personal protection of the Administrator. Such authority is derived from 5 U.S.C § 301, commonly referred to as a "housekeeping statute." Section 301 authorizes an agency head to "prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and

3

property." 5 U.S.C. § 301. The Comptroller General of the United States, who also heads the U.S.

Government Accountability Office ("GAO"), has interpreted this general grant of administrative

authority as permitting federal agencies to expend appropriated funds to assign employees to

provide protective services, and has advised that under § 301, an agency may authorize the use of

its appropriated funds, personnel, and assets to protect agency officials.[2] The Comptroller General

further advised that this authority extends to agencies without specific statutory authority for

protective services. In a decision analyzing the authority of the U.S. Department of the Treasury

to provide a protective service detail to the Secretary of the Treasury, the Comptroller General

opined,

> …if a Government official were threatened or there were other indications that he
> was in danger, and if it were administratively determined that the risk were such as
> to impair his ability to carry out his duties, and hence to affect adversely the
> efficient functioning of the agency, then funds of his agency, the use of which was
> not otherwise restricted, might be available to protect him, without specific
> statutory authority.

*In re the Secret Serv. Prot. for the Sec'y of the Treasury*, 54 Comp. Gen. 624, 628-29, (Jan. 28,

1975).[3] The Comptroller General's conclusion rests on the view that the deployment of security

personnel is "an executive function essential to the management of a department and the

performance of its business." *Id.* at 628-29.

Additionally, in *In re the Secret Serv. Prot. for the Sec'y of the Treasury*, the Comptroller

General stated that the GAO "would generally not object" to an agency providing protection

---

[2] *See, e.g., In re the Secret Serv. Prot. for the Sec'y of the Treasury*, 54 Comp. Gen. 624, 628-29, (Jan. 28, 1975), *as modified*, 55 Comp. Gen. 578, B-149372 (Dec. 18, 1975); *Matter of Home & Auto. Sec. Sys. for US. Customs Serv. Pers.*, B-251710 (July 7, 1993).

[3] *See also* U.S. Gov't Accountability Office, GAO/GGD/OSI-00-139, "Security Protection, Standardization Issues Regarding Protection of Executive Branch Officials," B-283892, at 12 (July, 2000) (noting that agencies may provide protection to their officials "if it is administratively determined that the efficiency of the agencies would be affected because of threats or other legitimate concerns over the safety of officials that would impair their abilities to carry out their duties").

4

services to its officials "where there is legitimate concern over the safety of an official and where the agency's functioning may be impaired by the danger to that official - to an agency." *Id.* at 629. On this basis, the GAO further opined that the "Secretary [of the Treasury] - in a proper case - may arrange for his protection by personnel of the Department of the Treasury or by the Secret Service, but in the latter case only on a reimbursable basis" even when the Secretary was not one of the officials the Secret Service was specifically authorized to protect under 18 U.S.C. § 3056. *Id.* at 630.[4]

Many federal agencies, like EPA, that lack specific statutory authority to provide protective services rely on the Comptroller General's interpretation of 5 U.S.C. § 301 to justify the expenditure of appropriated funds on protective services.[5] As the GAO noted in a report analyzing protection of executive branch officials across different federal agencies, "[f]rom fiscal years 1997 through 1999, … security protection was provided to officials holding 42 executive branch positions at 31 executive branch agencies." *Id.* at 2. The GAO catalogued security services provided to 14 Cabinet secretaries, four deputy or undersecretaries, and 24 other high-ranking officials. *Id.* at 7. Of these, "[o]nly two executive branch agencies ... –the Secret Service and the State Department—had specific statutory authority to protect executive branch officials, including the authority to carry firearms in carrying out their protective responsibilities." *Id.* at 11. The report goes on to explain that "[a]lthough none of the other agencies cited specific statutory authority to

---

[4] The Comptroller General's reasoning has appeared in other cases reviewing the protective services of other federal agencies. *See e.g.*, U.S. Gov't Accountability Off., GA0-04-261SP, Principles of Federal Appropriations Law (3d ed. 2004) (citing favorably to 54 Comp. Gen. 624 and *Matter of Home & Auto. Sec. Sys. for US. Customs Serv. Pers.*, B-251710 (July 7, 1993), in which the Comptroller General determined that the U.S. Customs Service may provide security devices for agents based on the risk created by their law enforcement responsibilities, the threat environment, and past threats against Customs personnel).

[5] *See* GAO Report, Security Protection, Standardization Issues Regarding Protection of Executive Branch Officials, B-283892 (2000).

5

protect their officials, that does not mean that the agencies are not authorized to provide such

services." *Id.* The GAO cited to its prior opinions in the report, explaining:

> In decisions of the Comptroller General, we have recognized that under certain
> circumstances, agencies can expend appropriated funds to protect their officials as a
> necessary expense. Such protection is warranted if it is administratively determined
> that the efficiency of the agencies would be affected because of threats or other
> legitimate concerns over the safety of officials that would impair their abilities to
> carry out their duties.
>
> *Id.* at 11-12.

Accordingly, pursuant to 5 U.S.C. § 301 and the above noted Comptroller General decisions

interpreting 5 U.S.C. § 301, the Agency has the authority to expend appropriated funds on the

protection of the Administrator.  We next turn to the issue of how agents that perform protective

services for the Administrator derive their law enforcement authority to carry firearms, execute

warrants, and make arrests.

B. PSD Agents Have Law Enforcement Authority Under 18 U.S.C. § 3063

In order for PSD agents to carry firearms, execute warrants, or make arrests in the

performance of their protective duties, they must have law enforcement authority. There is no

statutory provision that provides EPA with law enforcement authority specifically for law

enforcement officers who solely provide protective services. As stated above, however, 18 U.S.C.

§ 3063 does provide law enforcement authority for EPA law enforcement officers "with

responsibility for the investigation of" environmental crimes. Section 3063 specifically provides:

> any law enforcement officer of the Environmental Protection Agency with
> responsibility for the investigation of criminal violations of a law administered by
> the Environmental Protection Agency, may—
>> (1) carry firearms;
>> (2) execute and serve any warrant…; and
>> (3) make arrests…".

Therefore, whether an agent can have law enforcement authority rests on whether he or she has

been designated with "responsibility" for the investigation of environmental crimes. The most

6

important rule of statutory construction is to begin with the language of the statute.[6] As the Supreme Court has stated, "we begin with the understanding that Congress 'says in a statute what it means and means in a statute what it says there.'"[7] "When the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms. [internal quotations omitted]."[8] To determine the meaning of a statute's text, judges evaluate the "natural reading"[9] or "ordinary understanding"[10] of disputed words. Courts often refer to dictionaries to find this ordinary meaning.[11]

Here, the statute is clear. "[A]ny law enforcement officer … with responsibility for investigat[ing]" environmental crimes has law enforcement authority under 18 U.S.C. § 3063. The statute is neither ambiguous nor otherwise unclear in its meaning. When considering the ordinary meaning of the text of the statute, "with responsibility" can be reasonably interpreted to mean that PSD agents are to be available to be called on and do perform environmental criminal investigatory work.[12]

---

[6] See, e.g., Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1 (2000); see also Robinson v. Shell Oil Co., 519 U.S. 337 (1997); Conn. Nat'l Bank v. Germain, 503 U.S. 249 (1992); Mallard v. U.S.D.C. So. Dist. of Iowa, 490 U.S. 296, 300 (1989).

[7] Hartford Underwriters Ins. Co., 530 U.S. at 6 (quoting Conn. Nat'l Bank v. Germain, 503 U. S. at 254).

[8] Id. (citing United States v. Ron Pair Enters., Inc., 489 U. S. 235, 241 (1989) (quoting Caminetti v. United States, 242 U. S. 470, 485 (1917))); see also Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ., 550 U.S. 81, 93 (2007) ("[N]ormally neither the legislative history nor the reasonableness of the Secretary's method would be determinative if the plain language of the statute unambiguously indicated that Congress sought to foreclose the Secretary's interpretation.").

[9] Am. Hosp. Ass'n v. NLRB, 499 U.S. 606, 611 (1991).

[10] Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or., 515 U.S. 687, 697 (1995). See also Astrue v. Capato, 132 S. Ct. 2021, 2030, 2130 (2012).

[11] E.g., MCI Telecomms.Corp. v. AT&T Co., 512 U.S. 218, 227-29 (1994).

[12] In the Merriam-Webster dictionary, "responsibility" is defined as:

> 1: the quality or state of being responsible: such as
>> a: moral, legal, or moral accountability
>> b: reliability, trustworthiness
> 2: something for which one is responsible; burden

responsibility, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/responsibility.

7

We understand from OCEFT that all PSD agents' position descriptions include criminal investigatory responsibilities. Further, according to OCEFT, PSD agents presently perform environmental criminal investigatory work in addition to their protective service duties. Their criminal investigatory work includes activities such as executing warrants; serving subpoenas; conducting witness interviews; analyzing documents relevant to environmental criminal investigations; and evaluating incoming tips on potential criminal environmental violations. In light of the plain language of the statute, PSD agents derive law enforcement authority under 18 U.S.C. § 3063 provided they have responsibility for performing environmental criminal investigative work.[13]

A PSD agent's supervisor is in the best position to determine the actual responsibilities of his or her employees. To aid a supervisor in documenting the conclusion that an employee has responsibility for the investigation of environmental crimes, we recommend OCEFT develop a system that documents and tracks the following: the percentage of time each employee is expected to spend on investigating environmental crimes each year; the nature of environmental criminal investigatory activities actually conducted each year; and the percentage of time actually spent on such activities each year. We also recommend that OCEFT continue to ensure that all agents investigating environmental crimes include those responsibilities as part of their position

---

The word "responsible," in turn, is defined as, as applicable here:
    1a: liable to be called on to answer
    1b(1): liable to be called to account as the primary cause, motive, or agent a committee responsible for the job
    1b(2): being the cause or explanation mechanical defects were responsible for the accident
    1c: liable to legal review or in case of fault to penalties …
*responsible*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/responsible.

[13] Where PSD agents have responsibility for the investigation of environmental crimes, they may carry firearms, make arrests, and execute warrants even at times when they are not carrying out criminal investigatory duties, such as when they provide protective services for the Administrator.

8

descriptions.  There is no black letter law definition or answer as to what percentage of time or activities conducted are sufficient to conclude that an employee has "responsibility for" the investigation of environmental crimes.  Ultimately, the extent to which an employee has responsibility for the investigation of environmental crimes is a judgment made by the employee's supervisor.

### Conclusion

In summary, the Agency's authority to expend appropriated funds to provide protective services for the Administrator is derived from 5 U.S.C. § 301. Furthermore, PSD agents derive law enforcement authority from 18 U.S.C. § 3063 provided they have responsibility for performing environmental criminal investigative work. We recommend that OCEFT develop a system that documents and tracks the information identified above to aid the supervisor in documenting the conclusion that an employee has responsibility for the investigation of environmental crimes.

9

Appendix B

# *Initial Agency Response to Draft Report*



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C.  20460

JUN 2 9 2018

MEMORANDUM

SUBJECT:   Response to the May 30, 2018, Office of Inspector General's Draft Report,
            "Agents Assigned to Protective Service Detail Lack Statutory Authority to Protect the
            EPA Administrator"

FROM:       Matthew Z. Leopold, General Counsel
            Office of General Counsel

            Susan Parker Bodine, Assistant Administrator
            Office of Enforcement and Compliance Assurance

            Holly W. Greaves, Chief Financial Officer
            Office of the Chief Financial Officer

TO:         Arthur Elkins, Inspector General
            Charles Sheehan, Deputy Inspector General
            Office of Inspector General

Thank you for the opportunity to respond to the issues and recommendations presented in the
Office of Inspector General Draft Report, Project No. OPE-FY16-0265 regarding the protection
of the EPA Administrator. The Office of General Counsel and the Office of Enforcement and
Compliance Assurance disagree with the facts and legal conclusions set forth in the draft report,
as set forth in this letter as well as in the attached legal opinion of the General Counsel and the
attached redline of the draft report. The Office of the Chief Financial Officer believes that the
draft report includes misstatements, which are corrected in the attached redline.

**Chapter 2: EPA PSD Agents Lack Statutory Authority to Perform Law Enforcement
Functions**

Chapter 2 of the draft report states: "We concluded that the EPA's [Protective Service Detail]
PSD agents lack statutory authority to provide protective services for the EPA Administrator."
That statement is incorrect as a matter of law. PSD agents possess proper authority to perform
protective services for the Administrator under 5 U.S.C. § 301. Further, PSD agents' law
enforcement authority, which includes the authority to make arrests and carry firearms, is
derived from 18 U.S.C. § 3063, provided they have responsibility for the investigation of
environmental crimes.

The Office of Inspector General (OIG) draft report improperly conflates the Agency's general authority to provide protective services with the "law enforcement authority" of PSD agents. The authority to provide protective services is separate and apart from PSD agents' authority to carry firearms, execute warrants, make arrests, and perform other law enforcement functions. This improper conflation results in numerous errors throughout the draft report. Prior to the issuance of the draft Chapter 2, Office of General Counsel (OGC) conveyed the clear legal authority for both the existence of the PSD itself and the PSD agents' law enforcement authority to the OIG auditors.

The Agency has clear authority to assign employees to provide protective services under 5 U.S.C. § 301, as confirmed by Comptroller General decisions. In 1975, the Comptroller General determined that "if a government official were threatened or there were other indications that he was in danger, and if it were administratively determined that the risk were such as to impair his ability to carry out his duties, and hence to affect adversely the efficient functioning of the agency, then funds of his agency, the use of which was not otherwise restricted, might be available to protect him, without specific statutory authority." See 54 Comp. Gen. 624 (Jan. 28, 1975). Thus, all agencies, including EPA, have authority to expend appropriated funds to protect government officials.

As OGC staff had previously informed your staff, PSD agents derive law enforcement authority from 18 U.S.C. § 3063 whenever they have responsibility for the investigation of environmental crimes. 18 U.S.C. § 3063 states in part:

> "Upon designation by the Administrator of the Environmental Protection Agency, any law enforcement officer of the Environmental Protection Agency with responsibility for the investigation of criminal violations of a law administered by the Environmental Protection Agency, may— (1) carry firearms; execute and serve any warrant … ; and (3) make arrests without warrant … .".

Chapter 2 incorrectly states that "…because the duties of PSD agents do not comport with the plain language of 18 U.S.C. § 3063 … they are not authorized to carry firearms and conduct other law enforcement activities pursuant to that statute." Chapter 2 also incorrectly states that, "the agency appears to have taken the position that the law enforcement powers given to the Criminal Investigations Division (CID) agents under 18 U.S.C. § 3063 were automatically transferred to the agents' work in PSD." These assertions are inaccurate. OIG's analysis ignores PSD agents' actual current duties, specifically the vital fact that part of a PSD agent's time is spent on criminal investigatory work. OIG failed to include this key fact in its analysis, even though the Agency clearly noted this fact to the OIG. The fact that PSD agents currently spend some of their time investigating environmental crimes means that PSD agents *do* perform work that comports with the plain language of the statute. There is no "transfer" of authority from CID agents to PSD agents. PSD agents, like other CID agents, derive their law enforcement authority from 18 U.S.C. § 3063 provided they have responsibility for the investigation of environmental crimes.

The law enforcement authority conferred by 18 U.S.C. § 3063 is broad, as evidenced by the plain language of the statute which provides the authority for agents to make arrests for "any offense against the United States." 18 U.S.C. § 3063(3)(A). By meeting the plain language requirements of 18 U.S.C. § 3063 by maintaining responsibility for the investigation of environmental crimes, PSD agents carry that full law enforcement authority beyond the investigation of environmental crimes to their security work for the Administrator.

As requested in Chapter 2 of your draft report, on June 29, 2018, you received an opinion from the General Counsel that "articulates the underlying legal basis for the authority of the Protective Service Detail's agents." Therefore, the Agency has fulfilled your Chapter 2 recommendation and it is our expectation that Chapter 2 of the draft report will be deleted and the remainder of the draft report revised accordingly.

> OGC forwarded its legal opinion about statutory law enforcement authority for the PSD and it is included in its entirety as Appendix A of this report. The OIG does not take any position on the merits of the OGC analysis.
>
> The OGC legal opinion states that OCEFT must now determine how much time an agent must spend in the CID to transfer statutory law enforcement authority to the EPA's protective service. We modified Recommendation 2 to address this new requirement.

## Protective Services

Chapter 3 of the draft report concludes that: "The PSD lacks policies, procedures and standard operating procedures for the operational and administrative functions it performs" and "the services that the PSD provides to the Administrator are based on unsupported management decisions and discretion." The draft report draws this conclusion because the report rests on the inaccurate premise that a "formal threat assessment" is necessary to justify a level of protective services. Based on this faulty premise, the draft report then erroneously concludes that the absence of a "formal threat assessment" is the cause of the increase in the costs of protective services.

The draft report references Department of Justice definition of threat assessment from a report on managing terrorism and concludes that EPA must conduct a similar type of threat assessment to justify providing protective services. Specifically, the draft report recommends that the PSD conduct formal threat assessments that are based on "comprehensive and rigorous research and analysis," that incorporate "knowledge, assessments, and understanding of state, local, and private organizations and agencies," and that "assimilate germane, open source, or nonproprietary threat assessments, as well as intelligence information."

We disagree. While a threat assessment is a useful tool, it is just one tool. Further, the lack of threats does not mean that there is no risk or that protective services are not justified.

According to the Secret Service:

> "The purpose of U.S. Secret Service threat assessment and protective intelligence activities is to identify, assess, and manage persons who might pose a threat *to those we protect*, while the goal of these activities is to prevent assassination attempts."[4]

---

[4] Protective Intelligence & Threat Assessment Investigations, A Guide for State and Local Law Enforcement Officials, Research Report, U.S. Department of Justice, Office of Justice Programs (July 1998), at iii (emphasis added).

A threat assessment evaluates known threats. It does not address persons who do not make threats, who, according to the Secret Service, represent the majority of persons who attack public officials. [5]  Thus, a threat assessment, while informative, is not dispositive of a decision to provide protection nor what level of protection should be provided. A protectee could be at risk even if there are no direct threats made against him or her.

For example, James Hodgkinson, who attacked members of the Republican Congressional baseball team on June 14, 2017, made no threats prior to his attack.[6] A threat assessment as envisioned in the draft report would not have identified a need for the protective services provided to the House Majority Whip, Steve Scalise, on that day. However, if his detail had not been present at the morning practice of the Republican team, it is likely that most of the members of that team would now be dead.

The Secret Service's review of Jared Lee Loughner's actions before he shot Representative Gabrielle Giffords leads to similar conclusions. Mr. Loughner did not threaten Representative Giffords prior to attacking her. However, he had developed a pattern of disturbing behavior. In a review of this shooting, the Secret Service found that in many cases attackers had previously come to the attention of law enforcement, even though they had not made threats against protectees. Based on this finding, the review recommends collection of information from a broader range of sources to assess an individual's risk for violence. Specifically, the Secret Service made recommendations regarding the scope of a threat assessment similar to those in the draft report:

> When someone comes to the attention of law enforcement for engaging in threatening or concerning behavior, a threat assessment investigation may be initiated to assess the individual's risk for engaging in targeted violence. When conducting a comprehensive assessment of the risk a person may pose, it is essential to gather detailed information from multiple sources to enhance your understanding of the individual's life circumstances and why the individual engaged in the behavior that brought him or her to the attention of law enforcement.[7]

However, the difference between the Secret Service recommendations and the draft report is that the Secret Service does not suggest that a broad, system-wide, threat assessment is a predicate to providing personal protective services. Even if a protection unit embraces this systems approach for threat assessment investigations, there is no guarantee that all threats can be identified and risk eliminated.

Protective services are provided based on risk as well as threat assessments. Some protectees are at risk simply based on the positions they hold. We are, unfortunately, living in an era when political discourse is no longer polite and persons feel that political disagreements justify making statements on social media that incite violence. For example, in early June 2018, Occupy Wall

---

[5] Protective Intelligence & Threat Assessment Investigations, supra note 1, at 14.

[6]The Congressional Shooter: A Behavioral Review of James Hodgkinson, Department of Homeland Security, United States Secret Service, National Threat Assessment Center, October 2, 2017, at 1.

[7] National Threat Assessment Center. (2015). Using a systems approach for threat assessment investigations. A case study on Jared Lee Loughner. Washington, DC: U.S. Secret Service, Department of Homeland Security.

Street posted the current EPA Administrator's home address and encouraged persons to "take yr pitchfork to him directly." The person who originally posted that message may not pose a threat, but someone like James Hodgkinson could read that message and decide to take action.

Mr. Hodgkinson had been a supporter of Occupy Wall Street and on March 22, 2017, Hodgkinson posted on his Facebook page that he signed a Change.org petition calling for the removal of the President and Vice President of the United States from office for treason. He also commented on his post saying, "Trump is a Traitor. Trump Has Destroyed Our Democracy. It's Time to Destroy Trump & Co." Later, Mr. Hodgkinson drove to the Washington, D.C. area from his home in Illinois and attacked the Republican Congressional baseball team.

The draft report appears to assume that more complex threat assessments can reduce or eliminate the need for physical protection, thereby reducing costs. That assumption is not supported. As noted above, a threat assessment is an investigation into a known threat to try to prevent attacks. However, since most attacks are not preceded by a threat, physical protection remains a necessity. Further, the cost of conducting threat assessments of the scope described in the draft report could increase, not decrease, the PSD costs. We note that in FY 2017 the protective intelligence unit of the Secret Service included 204 agents and received $43 million in appropriations. That unit includes the National Threat Assessment Center, which conducts research on targeted violence and publishes those findings.

> The OIG agreed in the exit conference on July 23, 2018, to use the term threat analysis in the report. The threat analysis encompasses a threat assessment, level of any other risks, and the concerns of the protectee. Also, the threat analysis in its entirety documents and justifies the proper level of protection required for the Administrator.

In February 2017, the PSD was directed by the transition team for the new administration to provide 24/7 protection to the EPA Administrator, consistent with the level of protection provided to some other cabinet officials, and began to do so immediately upon his arrival. This level of protection has continued since that time due to continued risks and specific threats.

> The decisions related to these assertions have not been documented.

At EPA, the OIG's Office of Investigations sets policy, coordinates, and has overall responsibility for criminal investigations of allegations of threats against EPA employees. If the threats are against the Administrator, the OIG shares its information with the PSD. The EPA Office of Homeland Security provides information to the PSD on any potential national security threats – domestic or international. The PSD uses information from multiple sources, including open-source information and information from our federal/state/local law enforcement partners, to provide protection. EPA will continue this information collection to identify risks to the safety of the EPA Administrator and to mitigate known threats. The Office of Criminal Enforcement, Forensics, and Training, since January 2018, now performs a formal threat assessment every 90 days to inform decisions regarding protection of the EPA Administrator.

With respect to policies and procedures, OCEFT directives are applicable to the PSD and the PSD has standard operating procedures specific to protection work. OCEFT will update and finalize those SOPs.

## Payroll

The EPA's Office of the Chief Financial Officer is responsible for preparing the agency's biweekly time and attendance for transmission to the Department of Interior's Interior Business Center for payroll processing. OCFO internal controls related to biweekly pay cap requests and processing are in place and include 1) only allowing electronic updates and transmission of timecards to the pay roll provider from PeoplePlus, the agency's time and attendance system, ensuring biweekly pay is processed as intended and 2) only processing pay cap lift requests using the Pay Cap Lift SharePoint site ensuring requests are documented and authorized by the appropriate EPA personnel. IBC is implementing a new internal control in its payroll system, the Federal Personnel Payroll System, that will ensure that pay cap lift requests received from the agency are reviewed against the year worked. The combination of these processes and system improvements, coupled with the Office of Acquisition and Resource Management guidance on premium pay and premium pay requests will further strengthen the pay cap lift process and ensure the process performs as needed to avoid exceeding biweekly or annual pay caps inappropriately.

## RESPONSE TO RECOMMENDATIONS:

OGC, OECA, and OCFO are including a redline version of the draft report with this response so that the OIG can better track our recommended edits for specific sections of the report. Additionally, we are providing narrative comments addressing the report's recommendations below.

**RECOMMENDATION 1**: *Obtain a formal legal opinion from the EPA's Office of General Counsel that articulates the underlying legal basis for the authority of the Protective Service Detail's agents.*

- EPA's Office of General Counsel has provided a formal legal opinion affirming the authority of the PSD to provide protective services to the EPA Administrator. Therefore recommendation 1 should be removed from the draft report and the report should be revised accordingly.

**RECOMMENDATION 2:** *If the Office of General Counsel concludes that Protective Service Detail agents lack statutory authority to provide protective services, determine and initiate the proper action to remedy the issue.*

- EPA's Office of General Counsel has provided a formal legal opinion affirming the authority of the PSD to provide protective services to the EPA Administrator. Therefore

recommendation 2 should be removed from the draft report and the report should be revised accordingly.

**RECOMMENDATION 3**:  *Have the Office of Criminal Enforcement, Forensics and Training complete and document a threat assessment for the EPA Administrator on a regular basis to identify the proper level of protection required for the Administrator.*

- ***OECA Response: Agree in part; disagree in part.***

The OIG has acknowledged - and OECA agrees - that there is no legal requirement to conduct a threat assessment as a prerequisite to providing protective services. In fact, according to the Government Accountability Office report cited by OIG in the subject report, a majority (three-fourths) of the agencies providing protective services did not develop detailed, written threat assessments justifying their decisions to apply certain levels of protection and expend resources.

OECA understands that the OIG believes conducting threat assessments is a "best practice" and agrees with this view. In fact, OECA currently conducts a threat assessment every 90 days and OCEFT is in the process of developing an SOP for threat assessments (which we anticipate finalizing by September 30, 2018, along with the other SOPs). However, the audit report should be clear that (1) a threat assessment is not a predicate to providing protective services, (2) while OECA believes that a threat assessment can be a useful source of relevant information, the assessment itself cannot dictate the level of protection, (3) a threat assessment investigates known threats but not all attackers make threats, (4) there is no legal requirement to conduct a formal threat assessment, and (5) a threat assessment is scalable and not every assessment applies the systems approach recommended by the OIG. Finally, the level of protection provided to a protectee should be informed by the professional judgment of law enforcement professionals, in consultation with the protectee.

Additionally, when referring to the GAO, Department of Justice and Department of Homeland Security reports concerning threat assessments, the OIG report should clarify that these documents are designed for very different audiences with regards to a terrorist threat assessment versus a threat assessment performed in connection with protective services. The DHS Lexicon refers to homeland security risks and the DOJ report concerns the protection of critical infrastructure from terrorist acts; only GAO discusses threat assessments in the context of protective services.

Importantly, the GAO report did not specify how protective intelligence should be shared among agencies; how best to link threat assessment with the need for protection and level of protection provided; who should provide protection; whether agencies should be provided with specific statutory authority to provide protection; what training should be provided to personnel protecting federal officials, nor who should provide it. Rather, GAO recommended that the Director of the Office of Management and Budget, in consultation with the President, designate an official or group to assess these matters. OECA is not aware of this group being convened by OMB.

OECA is aware that on June 21, 2018, OMB released a government reform plan that recommends consolidating the protective details of certain government official under the U.S. Marshalls Service. In this recommendation, OMB proposes that: "The number of Deputy U.S. Marshals provided for any approved protection of an official would vary based on the individual's threat assessment *and risk*."  According to OMB, currently agencies have full autonomy in determining the size and scope of their details' activities. Under this proposal, "[d]eterminations as to whether protection would be provided and its size and scope would be made by the USMS in consultation with affected agency heads."

OECA believes that a number of salient points raised in the GAO report should be reflected in the OIG's final report to more accurately characterize that in fact threat assessments are done differently at different agencies based on many factors, and that EPA's practices are consistent with other agencies. These would include:

- o "Security officials generally said they determined their officials needed protection as a result of possible threats and actual threats received from individuals who were (1) opposed to the policies and issues being handled by their agencies, (2) apparently suffering from mental problems, (3) opposed to the officials personally, and (4) terrorists."

- o "Security officials also said the level of protection provided was determined by a variety of factors, including the sensitivity of issues being handled by the agency, the visibility of the protected officials to the public, travel needs, and the officials' personal preferences."

- o "Who decided the level of protection to be applied varied from agency to agency. Security officials at six of the 27 agencies indicated that the protected officials decided their overall level of protection on the basis of their personal preferences and sometimes upon the recommendations of their security staffs. At eight agencies, security officials said the level of protection provided was decided jointly by them and the protected officials on the basis of actual and perceived levels of threat against the agencies and the protected officials. With regard to the other 13 agencies that provided protection, including the agencies with security protection as one of their primary missions, security officials said they, and occasionally with input from other staff, decided the level of protection on the basis of protective intelligence."

In addition, the OIG's final report should reflect the findings of the 1998 U.S. Secret Service study cited by GAO, including the finding that persons who make threats are often not the persons who actually carry out an attack. Thus, an assessment of known threats does not obviate the need for physical security.

**RECOMMENDATION 4**: *Using a justified level of protection based on a threat assessment, determine appropriate staffing and corresponding schedules for Protective Service Detail agents.*

- **OECA Response: Disagree.** OECA understands that the OIG believes conducting threat assessments is a "best practice" and agrees with this view as stated in our response to Recommendation 3. However, the assessment itself cannot solely dictate the level of protection. Recommendations regarding the level of protection are informed by the professional judgment of law enforcement professionals in consultation with the protectee.

**RECOMMENDATION 5:** *Create and implement comprehensive policies, procedures and standard operating procedures covering the Protective Service Detail operations and proper protection level determinations.*

- **OECA Response: Agree in part.** OCEFT's policies, procedures and guidance (collectively called "directives") flow from the law enforcement authority conferred by 18 U.S.C. § 3063, and govern Special Agents' conduct as law enforcement officers ranging from the carry and use of firearms, use of force, the execution of warrants, making of arrests, etc. These directives apply to all OCEFT law enforcement officers, including those serving on the PSD.

  In addition to OCEFT's directives, the PSD has standard operating procedures specific to protective services, which were developed by former United States Secret Service agents based on their protection experience and provide a level of consistency, effectiveness and efficiency to PSD operations. OCEFT is in the process of updating these SOPs, which we anticipate finalizing by September 30, 2018, and issued interim guidance governing PSD activities until the SOPs are finalized.

**RECOMMENDATION 6:** *Determine the amount of overtime that was improperly authorized for Protective Service Detail agents in calendar years 2016 and 2017 and identify the amounts paid as improper payments.*

- **OECA Response: Disagree.** We do not believe that these payments themselves were improper as they were made to the employees for actual work performed.

  Office of Management and Budget Circular A-123, Appendix C, Requirements for Effective Measurement and Remediation of Improper Payments; and the Improper Payments Elimination and Recovery Improvement Act of 2012 inform agencies as to what constitutes an "improper payment." Appendix C of the Circular defines an improper payment as any payment that should not have been made or that was made in an incorrect amount under statutory, contractual, administrative, or other legally applicable requirements. Incorrect amounts are overpayments or underpayments that are made to eligible recipients. The payments made to PSD agents were, in fact, payments made for actual overtime worked and as such, these payments were not improper even though the pre-approval requests for overtime may not have been according to best practices.

OECA confirmed with EPA's Office of the Chief Financial Officer that OCFO agrees that the payments made to the PSD agents were not improper. OCEFT acknowledges that for a period of time, the PSD Special Agent in Charge was signing paper pre-approvals for overtime and has since corrected that to ensure even the paper pre-approvals are reviewed and signed by the appropriate OCEFT official.

**RECOMMENDATION 7:** *Report improper payments to Protective Service Detail agents to the Office of the Chief Financial Officer for inclusion in the annual Agency Financial Report.*

- ***OECA Response: Disagree.*** As state above, OECA does not believe PSD time, including overtime, were improper payments. As such, Chapter 4 should be revised to reflect that or struck in its entirety.

**Recommendation 8:** *Revisit the office's decision to terminate the debt collection associated with the Protective Service Detail agent who had received the overpayment.*

- The Office of General Counsel, through the Acting EPA Claims Officer, on June 4, 2018, reopened the waiver decision in which the Protective Services Detail agent's debt for overpayment was terminated. Therefore, recommendation 8 should be should be removed from the draft report and the report should be revised accordingly.

**Recommendation 9:** *Request a pay audit of the calendar year 2017 wages for the Protective Service Detail agent who had received the overpayment and determine the amount the agent exceeded the 2017 pay cap.*

- ***OCFO Response: Agree.*** The OCFO's Office of Technology Solutions completed an internal analysis leveraging the IBC DataMart data and provided to the OIG on June 25, 2018. The analysis was of unauthorized payments above the annual statutory pay cap that have been made to other EPA employees in 2016 and 2017. The PSD agent information was included. OCFO requested a pay audit from IBC on June 27, 2018.

  Corrective Action Completion Date:  September 30, 2018

**OIG Recommendation 10:** *Recover the $16,299.33 for which the waiver for the Protective Service Detail agent who had received the overpayment was denied and any additional overpayment determined by the pay audit.*

**OCFO Response: Agree.**

The OCFO will collect any and all debts upon completion of the OGC's review and final determination.

Corrective Action Completion Date:  September 30, 2018.

**OIG Recommendation 11:** *Design and implement new controls to prevent the reoccurrence of unauthorized payments that will put an employee above the annual statutory pay cap.*

**OCFO Response: Agree.**

The OCFO has worked to strengthen controls related to pay cap lift requests since early 2017.

In 2016, requests for a retroactive pay cap lift were manually processed – retroactively submitted timecards would be printed, signed, and sent to the Department of Interior's IBC Payroll Operations Center for manual time entry by IBC technical staff into the Federal Personnel Payroll System. Timecards also were manually recorded with the code "LB" or "lift biweekly" instructing the payroll provider to lift the pay cap and apply premium pay based on the employee's pay plan and locality to the annual limit. This manual adjustment/override process in PeoplePlus circumvented FPPS controls over biweekly limits which allowed the overpayments in question to occur.

In February 2017, the OCFO fixed a defect in PPL which allowed manual timecards submitted for retroactive pay cap lifts to be sent to the payroll provider. The defect fix eliminated this manual override; the PPL system functionality now only permits electronic updates of timecards to be sent to IBC, thus permitting the system to perform an automated validation to ensure biweekly pay is processed as intended.

In September 2017, the OCFO introduced the Pay Cap Lift SharePoint site which is a tool that created a more effective way for the OCFO to receive pay cap lift requests. The process requires the Shared Service Center to enter and upload all pay cap lift request information and supporting documentation into one central location. The site automatically creates an EPA help desk ticket notifying the OCFO that a pay cap lift request for an employee has been submitted. The OCFO confirms the information supporting the request. If the request is not supported and or there is missing information, the OCFO works with the Shared Service Center and/or the employee until issues are resolved; requests that are not supported are not processed. If the information for the request is in order, the action is processed using the PPL which includes the employee's information and pay cap start and end dates. This information is electronically transmitted to the IBC and informs the payroll provider that it is "okay" to calculate overtime pay on the hours and dates submitted. The IBC internally calculates the biweekly pay amount for that time period, checking that the employee pay amount is not over the annual limit. The site provides a central location for submitting, supporting, tracking and processing of an employee's pay cap lift request.

 At an IBC meeting earlier this month, the group voted on an FPPS system change which will check that "any biweekly pay cap lift request is edited against the proper year". This is an IBC internal control that will ensure that pay cap lift requests received from the agency are reviewed against the year worked. The implementation date is yet to be determined.

Finally, the Office of Administration and Resources Management's Office of Human Resources provides to the agency the pay cap request process guidance and controls in the following documents 1) Pay Administration Manual, Chapter 15-Policy on Limitation of Pay, October 1991, which provides pay cap waiver guidance and Delegation of Authority; 2) Pay

Administration Manual, Appendix 3-Authorization for an Exception to the Biweekly Maximum Earnings Limitation, October 1991, which provides authorization by the designated Delegated Authority and the Human Resources Officer; and 3) Biweekly Pay Cap Waiver Standard Operating Procedures, June 2015, which provides procedures for processing waivers to the Biweekly Maximum Earning Limitation for employees working overtime in emergencies involving direct threats to life or property and/or natural disaster.

The combination of system improvements made to PPL, the implementation of the SharePoint site, and the IBC FPPS improvement, coupled with the OARM's OHR guidance on premium pay and premium pay requests will further strengthen the pay cap lift request process and ensure the process performs as needed to avoid exceeding biweekly or annual pay caps inappropriately.

By September 2018, in conjunction with the review of sensitive payments, the OCFO will conduct a statutory pay cap internal control review. This review, in accordance with OMB A-123, Appendix A, will validate existing controls are in place to mitigate agency employees exceeding the biweekly pay cap. In the event a pay cap lift is necessary, this review will verify proper waiver documentation is in place.

Corrective Action Completion Date:  September 30, 2019

**OIG Recommendation 12:**  *Determine whether similar unauthorized payments above the annual statutory pay cap have been made to other EPA employees in 2016 and 2017, and recover any overpayments as appropriate.*

- **OCFO Response: Agree.**

OCFO-OTS provided an analysis of unauthorized payments above the annual statutory pay cap that have been made to other EPA employees in 2016 and 2017 to the OIG.

Corrective Action Completion Date:  June 25, 2018

## CONTACT INFORMATION

If you have any questions regarding this response, please contact Gwendolyn Spriggs, OECA's Audit Follow Up Coordinator on (202) 564-2439, or via email spriggs.gwendolyn@epa.gov; Benita Deane, OCFO's Audit Follow Up Coordinator on (202)- 564-2079, or via email deane.benita@epa.gov; Mahri Monson, OGC's Follow Up Coordinator on (202) 564-2657, or via email monson.mahri@epa.gov.

cc:     Larry Starfield
        Patrick Traylor
        Gwendolyn Spriggs
        Henry Barne
        Pam Mazakas
        Jessica Taylor
        Carolyn Dick Mayes

David Bloom
Howard Osborne
Jeanne Conklin
Quentin Jones
Meshell Jones-Peeler
Malena Brookshire
Kevin Minoli
Mahri Monson
Benita Deane

Attachments

Appendix C

# *Agency Response to Revised Recommendations*



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

AUG 1 4 2018

OFFICE OF
ENFORCEMENT AND
COMPLIANCE ASSURANCE

### MEMORANDUM

**SUBJECT:** OECA Comments on Revisions to Recommendations in the OIG Draft Report, "*Agents Assigned to Protective Service Detail Lack Statutory Authority to Protect the EPA Administrator*," Project No. OA-FY16-0265, dated May 30, 2018

**FROM:** Susan Parker Bodine, Assistant Administrator

**TO:** Arthur Elkins, Inspector General

**CC:** Matthew Z. Leopold, General Counsel
Holly W. Greaves, Chief Financial Officer

On June 29, 2018, the Office of General Counsel, the Office of Enforcement and Compliance Assurance, and the Office of the Chief Financial Officer provided comments (both narrative and a red-line strikeout) on OIG Project No. OA-FY16-0265, relating to the Administrator's protective service detail. On that date you also received an Opinion of the Office General Counsel identifying the source of the Agency's legal authority to provide protective services to the Administrator.

On July 23, 2018, we met with Charles Sheehan and members of the OIG staff to discuss the unsupported statements in the Draft Report for OIG Project No. OA-FY16-0265. It was our understanding from that meeting that the OIG recognized there were significant problems with the original Draft Report and would be making extensive changes, including considering revising the Report title, since the title of the Draft Report was inaccurate and misleading. Given this unusual circumstance and to ensure our comments are relevant to the actual report to be released by the OIG, we requested the opportunity to review and comment on the revised report. However, the OIG denied this request.

The July 23, 2018, meeting was an exit conference to discuss the agency's response to the draft report and any changes that the OIG intended to make to the report. It is not unusual, based on agency comments and the discussions that take place at an exit conference, for the OIG to make edits to its draft report, including the report title. In the OIG's opinion, the draft report was not inaccurate or misleading, and the changes made as a result of the agency's responses and discussions were not significant or extensive. Although the agency requested to review the report revisions and provide a response, this request was not honored because it would essentially be a reissuance of the draft report, which is not in line with established reporting processes.

Instead, on August 1, we received an email with changes to recommendations 2, 3, and 4. We are left to assume that all of chapter 2, on which recommendations 1 and 2 were based, as well as all of chapter 3, on which recommendations 3, 4, and 5 were based, remain in the report, despite the unsupported statements in those chapters.

In the OIG's opinion, there were no unsupported statements in the draft report and all facts and figures were independently verified prior to issuance.

Accordingly, the June 29, 2018, comments, including the memorandum and the red-line strikeout, remain the Agency's response to the Draft Report, and this memorandum addresses only the revised recommendations. For those recommendations with which the Agency agrees, we have provided corrective actions and estimated completion dates. For those recommendations with which the Agency does not agree, we have explained our position and proposed alternatives to the recommendations.

In compliance with OIG practices, agency red-line comments are considered but are not always incorporated into the final OIG report.

It is important to understand, with respect to Recommendations 3 and 4, that a threat analysis, while informative, is not dispositive of a decision to provide protection nor what level of protection should be provided. Further, the lack of threats does not mean that there is no risk or that protective services are not justified. If Recommendations 3 and 4 are not revised as suggested below, the Agency non-concurs on both.

The OIG agreed in the exit conference on July 23, 2018, to use the term threat analysis in the report. The threat analysis encompasses a threat assessment, other risks, and the concerns of the protectee. Also, the threat analysis in its entirety documents and justifies the proper level of protection required for the Administrator.

Please include both today's comments and those submitted on June 29 in your final report on the Protection Service Detail.

**AGENCY'S RESPONSE TO REPORT RECOMMENDATIONS:**

**Agreements:**

| No. | Revised Recommendation | Response | Intended Corrective Action(s) | Estimated Completion by Date, Quarter and FY |
|-----|------------------------|----------|-------------------------------|----------------------------------------------|
| 2 | Implement the Office of General Counsel opinion through new policies, procedures and/or guidance that defines the amount of time agents must spend on investigating environmental crimes and how the time will be monitored and documented by supervisors. | Concur. | OECA/OCEFT will develop new policies, procedures and/or guidance that defines the amount of time agents must spend on investigating environmental crimes, informed by the General Counsel opinion. | Initiated tracking time agents spend investigating environmental crimes September 30, 2017 (4th quarter 2017). Develop policies, procedures, and/or guidance by September 30, 2018 (4th quarter FY 2018). |
| 3 | Have the Office of Criminal Enforcement, Forensics and Training complete and document a threat *analysis* for the EPA Administrator on a regular basis to *justify* the proper level of protection required for the Administrator. | Concur if revised to state, "Have OECA/OCEFT complete and document a threat analysis for the EPA Administrator on a regular basis." As discussed in the Agency's June 29, 2018 response to the draft report, a threat analysis, while informative, is not dispositive of a decision to provide protection nor what level of protection should be provided. Further, the lack of threats does not mean that there is no risk or that protective services are not justified. | 1.OECA/OCEFT to conduct and document a threat analysis on a regular basis (approximately twice a year). 2.OECA AA and law enforcement professionals in the PSD to discuss threat analyses with the Administrator to inform decisions regarding level and type of protection. | Regular threat analyses initiated January 2018 (2nd quarter FY 2018). |

| 4 | Using a justified level of protection based on a threat *analysis*, determine appropriate staffing and corresponding schedules for Protective Service Detail agents. | See comments above regarding recommendation 3. Concur if revised to state, "OECA should provide information, including the results of a threat analysis and discussions with the protectee, to help inform decisions regarding the appropriate level of protection. OCEFT should then establish the staffing and corresponding schedules for Protective Service Detail agents." | OECA/OCEFT to manage staffing and scheduling of the Administrator's protective service detail based on the level of protection. | Initiated February 2017 (2nd quarter FY 2017). |

**CONTACT INFORMATION**:

If you have any questions regarding this response, please contact Gwendolyn Spriggs, OECA's Audit Follow Up Coordinator on 202-564-2439, or via email, spriggs.gwendolyn@epa.gov.

Attachments:
1. Agency response dated June 29, 2018
2. Agency tracked changes of Draft Report
3. OGC Legal Opinion dated June 29, 2018

cc: R. Jackson, OA/COS
    C. Sheehan, OIG/DIG
    K. Christensen, OIG/AIG
    J. Trefry, OIG/Director
    L. Starfield, OECA/PDAA
    P. Traylor, OECA/DAA
    H. Barnet, OCEFT/OECA/Director
    P. Mazakas, OCEFT/OECA/Director
    M. Monson, OGC/AFC
    B. Trent, OCFO/AFC
    G. Spriggs, OECA/AFC

# *Distribution*

The Administrator
Deputy Administrator
Chief of Staff
Special Advisor, Office of the Administrator
Chief Financial Officer
Assistant Administrator for Enforcement and Compliance Assurance
General Counsel
Agency Follow-Up Coordinator
Associate Administrator for Congressional and Intergovernmental Relations
Associate Administrator for Public Affairs
Deputy Chief Financial Officer
Associate Chief Financial Officer
Controller, Office of the Controller, Office of the Chief Financial Officer
Principal Deputy Assistant Administrator for Enforcement and Compliance Assurance
Deputy Assistant Administrator for Enforcement and Compliance Assurance
Principal Deputy General Counsel
Associate General Counsel, General Law Office, Office of General Counsel
Director, Office of Criminal Enforcement, Forensics and Training,
        Office of Enforcement and Compliance Assurance
Director, Office of Continuous Improvement, Office of the Administrator
Audit Follow-Up Coordinator, Office of the Administrator
Audit Follow-Up Coordinator, Office of the Chief Financial Officer
Audit Follow-Up Coordinator, Office of Enforcement and Compliance Assurance
Audit Follow-Up Coordinator, Office of General Counsel

# EXHIBIT 2



**U.S. GOVERNMENT ACCOUNTABILITY OFFICE**

**United States Government Accountability Office**
**Washington, DC  20548**

B-329603

April 16, 2018

The Honorable Tom Carper
Ranking Member
Committee on Environment and Public Works
United States Senate

The Honorable Tom Udall
Ranking Member
Subcommittee on Interior, Environment, and Related Agencies
Committee on Appropriations
United States Senate

The Honorable Peter DeFazio
Ranking Member
Committee on Transportation and Infrastructure
House of Representatives

The Honorable Betty McCollum
Ranking Member
Subcommittee on Interior, Environment, and Related Agencies
Committee on Appropriations
House of Representatives

Subject:   *U.S. Environmental Protection Agency—Installation of Soundproof*
*Privacy Booth*

This responds to your request for an opinion regarding the U.S. Environmental
Protection Agency's (EPA) use of its fiscal year (FY) 2017 appropriations to install a
soundproof privacy booth in the EPA Administrator's office.  Specifically, you ask
whether EPA obligated FY 2017 funds in a manner consistent with section 710 of
the Financial Services and General Government Appropriations Act, 2017 (section
710) and the Antideficiency Act.[1]

---

[1] Letter from Representative Betty McCollum, Ranking Member of the Subcommittee
on Interior, Environment, and Related Agencies, to Comptroller General (Jan. 12,
2018); letter from Senator Tom Carper, Ranking Member of the Committee on
Environment and Public Works, to Comptroller General (Jan. 9, 2018); letter from
(continued...)

Section 710 prohibits an agency from obligating or expending an amount in excess of $5,000 to furnish, redecorate, purchase furniture for, or make improvements for the office of a presidential appointee during the period of appointment without prior notification to the Committees on Appropriations of the House of Representatives and the Senate.  Pub. L. No. 115-31, div. E, title VII, § 710, 131 Stat. 135, 379 (May 5, 2017).  The Antideficiency Act prohibits federal agencies from incurring obligations in excess of the amount available in an appropriation.  31 U.S.C. § 1341(a).

As explained below, we conclude that EPA violated section 710 when it obligated $43,238.68 for the installation of a soundproof privacy booth without providing advance notice to the Committees on Appropriations of the House of Representatives and the Senate.  Further, because EPA obligated appropriated funds in a manner specifically prohibited by law, we conclude that EPA violated the Antideficiency Act.

Consistent with our practice for legal opinions, we requested and received from EPA's Office of General Counsel information regarding the factual circumstances of this matter, as well as its legal views regarding whether EPA's actions complied with section 710 and the Antideficiency Act.  Letter from Principal Deputy General Counsel, EPA, to Managing Associate General Counsel, GAO (Mar. 23, 2018) (EPA Letter); Letter from Managing Associate General Counsel, GAO, to Acting General Counsel, EPA (Dec. 21, 2017); GAO, *Procedures and Practices for Legal Decisions and Opinions*, GAO-06-1064SP (Washington, D.C.: Sept. 2006), *available at* www.gao.gov/products/GAO-06-1064SP.

BACKGROUND

EPA obligated $43,238.68 from its FY 2017 Environmental Programs and Management (EPM) appropriation account for the installation of a soundproof privacy booth for the Administrator's office.[2]  EPA did not send advance notice of this obligation to the Committees on Appropriations of the House of Representatives and the Senate.[3]

_____

(...continued)
Representative Peter DeFazio, Ranking Member of the House Committee on Transportation and Infrastructure, to Comptroller General (Jan. 9, 2018); letter from Senator Tom Udall, Senate Committee on Appropriations, Ranking Member of the Subcommittee on Interior, Environment, and Related Agencies, to Comptroller General (Nov. 9, 2017).

[2] EPA Letter, at 2.

[3] *Id.* at 4–5.

EPA stated that the amounts obligated included $24,570 for "Privacy booth purchase, delivery, and assembly," $3,470 for "Concrete Floor Leveling," $3,360.97 for "Drop Ceiling Installation," $3,350 for "Prep and Wall Painting," $7,978 for "Removal of CCTV Equipment," and $509.71 for "Infrastructure Cabling and Wiring."[4]  The contract for the privacy booth itself required that the booth "be assembled by modular components."[5]  According to EPA, the area in which the privacy booth is located, a former storage closet in the Administrator's office, is assigned to the Administrator.[6]

EPA provided that its "Security Management Division requires that a classified telephone must be located in an area where the employee can have private conversations.  That is, a classified phone cannot simply be put on an office desk or in a conference room."[7]  According to EPA, the booth "not only enables the Administrator to make and receive phone calls to discuss sensitive information, but it also enables him to use this area to make and receive classified telephone calls (up to the top secret level) for the purpose of conducting agency business."[8]

DISCUSSION

Section 710: Statutory Notification Requirement

Section 710 provides:

> "During the period in which the head of any department or agency, or any other officer or civilian employee of the Federal Government appointed by the President of the United States, holds office, no funds may be obligated or expended in excess of $5,000 to furnish or redecorate the office of such department head, agency head, officer, or employee, or to purchase furniture or make improvements for any such office, unless advance notice of such furnishing or redecoration is transmitted to the Committees on Appropriations of the House of Representatives and the Senate.  For the purposes of this section, the term 'office' shall include the entire suite of offices assigned to the individual, as well as any other space used primarily by the individual or the use of which is directly controlled by the individual."

---

[4] *Id.* at 2*.*

[5] EPA, Order No. EP-17-H-000248, at 3 (Aug. 29, 2017).

[6] EPA Letter, at 4.

[7] *Id.*

[8] *Id.* at 3–4.  EPA did not state whether the booth has been certified as a "Sensitive Compartmented Information Facility" (SCIF).

Pub. L. No. 115-31, div. E, title VII, § 710.  As relevant here, section 710 requires that an agency notify the appropriations committees before it (1) obligates in excess of $5,000 to (2) furnish, redecorate, purchase furniture for, or make improvements for (3) the office of the Administrator, with the word "office" having a specific statutory definition for the purposes of this section.[9]

It is clear that two of the three elements of the section 710 notification requirement have been met.  First, EPA obligated in excess of $5,000 by obligating over $24,000 for the booth itself and over $18,000 for the associated space reconfiguration costs.[10]  Second, the privacy booth is, for purposes of section 710, located in the Administrator's office.  EPA states that the "area where the privacy booth is located is assigned to the Administrator" and that the "privacy booth is located in the Administrator's office as that term is defined under section 710."[11]  Thus, at issue here is whether EPA obligated these funds to furnish, redecorate, purchase furniture for, or make improvements for the Administrator's office.

As with any question of statutory interpretation, a section 710 analysis begins with the statute's text.  *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009).  Where, as here, the language of a statute is unambiguous, the ordinary meaning of the statute controls.  *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009); B-326013, Aug. 21, 2014.  When a term is not defined in the legislation itself, a court may turn to the dictionary definition for its common meaning.  *United States v. Lehman*, 225 F.3d 426, 428—29 (4th Cir. 2000).  *See NLRB v. Canning*, ___ U.S. ___, 134 S. Ct. 2550, 2561 (2014); *Bilski v. Kappos*, 561 U.S. 593, 603, 607 (2010); *Carcieri*, 555 U.S. at 388; *Dodd v. United States*, 545 U.S. 353, 358 (2005); *MCI Telecommunications Corp. v. AT&T Co.*, 512 U.S. 218, 225—27 (1994); *United States v. Vargas-Duran*, 356 F.3d 598, 602—03 (5th Cir. 2004).

---

[9] As provided, section 710 applies "[d]uring the period in which the head of any department or agency, or any other officer or civilian employee of the Federal Government appointed by the President of the United States, holds office."  Pub. L. No. 115-31, div. E, title VII, § 710.  Because the EPA Administrator is appointed by the President of the United States, the circumstances in this opinion satisfy this criterion for the application of section 710.  *See* Reorganization Plan No. 3 of 1970, *Environmental Protection Agency*, § 1, 35 Fed. Reg. 15623, 15623 (Oct. 6, 1970), *reprinted in* 5 U.S.C. app. at 189 (2006), *and in* 84 Stat. 2086 (1970) (providing that the President appoints the Administrator).

[10] EPA Letter, at 2.

[11] *Id*. at 4.

In analyzing statutory language, we must assume that each word has meaning and that Congress was aware of such meaning when it included each term in the legislation.  *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (*citing Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 698 (1995) (noting the Court's reluctance to treat any statutory language as surplusage); *United States v. Menasche*, 348 U.S. 528, 538─39 (1955) (*citing Montclair v. Ramsdell*, 107 U.S. 147, 152 (1882)); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979); *Disabled in Action v. SEPTA*, 539 F.3d 199, 210 (3rd Cir. 2008).  Accordingly, we construe statutes "such that no word is left without operative effect."  *Vargas-Duran*, 356 F.3d at 602.  These canons of statutory interpretation are to be applied in conjunction with the longstanding rule that "distinct words have distinct meanings." *Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 358 (2005).

In accordance with these principles, we conclude that Congress intended for each of the four limitations in section 710 to have distinct operative effect.  The four types of obligations that require notification under section 710 are:  (1) to furnish; (2) to redecorate; (3) to purchase furniture for; or (4) to make improvements for.  By using the word "or," Congress created a disjunctive list.  Thus, an obligation that falls under any one of these conditions will trigger the notification requirement.  *See Azure v. Morton*, 514 F.2d 897, 900 (9th Cir. 1975).

As used in ordinary English, the verb "furnish" means "to equip with what is needed, especially to provide furniture for."  *American Heritage Dictionary of the English Language* 713 (4th ed. 2009) (definition of "furnish").  In drafting section 710, Congress included both the verb "furnish" and the phrase "purchase furniture for."  Because interpreting "furnish" as referring merely to furniture would render the phrase "purchase furniture for" surplusage, to "furnish" must include not only buying furniture, but also, consistent with its definition, supplying the office with other equipment.

In its letter to our Office, EPA stated that "[t]he agency's installation of a soundproof privacy booth and the outfitting of space to house it constitute a change to the functionality of unused space in order to support specific mission requirements."[12] According to EPA, the privacy booth "serves a functional purpose" by allowing the Administrator to carry out agency business "without concern that classified, deliberative, privileged, or sensitive information might inadvertently be disclosed to those who are not intended to receive such information."[13]  EPA also maintained that the "privacy booth is analogous to other functional items an employee might require to perform his job duties such as a high speed computer, high speed copier/scanner, or television."[14]

---

[12] *Id.* at 3.

[13] *Id*.

[14] *Id*. at 4.

Thus, by EPA's own terms, the installation of the privacy booth equips the office with a new, practical addition to the office:  a space in which the Administrator may conduct official telephone calls concerning classified, deliberative, privileged, or sensitive matters.  Indeed, EPA states that its "obligation of funds for the installation of a privacy booth was an expense necessary to ensure that the Administrator's office was equipped with an item that enables the Administrator to conduct agency business in a private space"[15] and that installation of the booth "allow[s] [the Administrator] to perform his official duties."[16]  EPA's statements place the privacy booth squarely within the meaning of "furnish," as the booth equipped the office with something that EPA asserts it needed.  Accordingly, section 710 applied to this obligation and EPA was required to notify the appropriations committees of its proposed obligation.

EPA argues that section 710 does not apply to the obligation of funds for the installation of the privacy booth because the privacy booth "does not constitute an aesthetic improvement contemplated by section 710."[17]  According to EPA, the "purpose of the $5,000 redecorating limitation is to ensure that Congress is aware of any funds (above $5,000) that are being spent for items to accommodate the individual preferences of the appointee, rather than for items to conduct official agency business."[18]  This interpretation is inconsistent with the plain meaning of section 710.  As discussed above, section 710 requires notification for each of four distinct types of obligations:  (1) to furnish; (2) to redecorate; (3) to purchase furniture for; or (4) to make improvements for.  The common meaning of the verb "redecorate" is "to change the appearance or furnishings of."  *American Heritage Dictionary* at 1463 (definition of "redecorate").  The root of that term—"decorate"— means to "adorn with something ornamental."  *Id*. at 472.  EPA improperly attributes the aesthetic root of the term "redecorate" to the remaining three phrases, each of which involve functional changes for an office.  By using four separate terms and requiring advance notification for each, Congress enacted a provision that applies not only to changes that are primarily aesthetic, but also to changes that provide a practical benefit for an office.

In accordance with the plain meaning of the statutory language and EPA's own statements regarding the privacy booth, section 710 applies to this obligation and, accordingly, EPA was required to notify the appropriations committees of its proposed obligation.  By failing to provide such advance notice, EPA violated section 710.  We draw no conclusions regarding whether the installation of the privacy booth

---

[15] *Id.* at 1.

[16] *Id.* at 4.

[17] *Id*. at 3.

[18] *Id.*

was the only, or the best, way for EPA to provide a secure telephone line for the Administrator.[19]  EPA's failure to make the necessary notification is the only subject of this opinion.  However, we recognize the requirement to protect classified material and the need for employees to have access to a secure telephone line when handling such information in the course of conducting official agency business.  After making the required notification, section 710 would have presented no bar to EPA's activities.

<u>Application of the Antideficiency Act</u>

An agency violates the Antideficiency Act if it incurs an obligation in excess of legally available amounts.  31 U.S.C. § 1341(a); B-327432, June 30, 2016; B-319009, Apr. 27, 2010.  In B-327432, we held that, in violating a similar notification requirement (section 711) in the Consolidated Appropriations Act, 2010, the Federal Maritime Commission (FMC) also violated the Antideficiency Act.[20]  B-327432, at 3—4.  As we explained in that decision, Congress had conditioned the availability of funds on the agency's compliance with the notification requirement and, because FMC had failed to notify the appropriations committees of Congress of its proposed obligation, the funds were not legally available.  *Id.* at 3 (noting that "Congress has the right to predicate the availability of appropriations on compliance with specified notification requirements"); *see also* B-319009, Apr. 27, 2010.

In this case, EPA violated the FY 2017 version of this same notification requirement when it obligated funds in excess of $5,000 without providing the appropriations committees with advance notice of its proposed obligation.  Because EPA did not comply with the notification requirement, the funds were not legally available at the time EPA incurred the obligation.  By obligating in excess of the amount available, EPA violated the Antideficiency Act.  31 U.S.C. § 1341(a).  EPA should report its Antideficiency Act violation as required by law.  31 U.S.C. § 1351.

---

[19] In addition to the privacy booth in the Administrator's office, there are two SCIFs in the EPA headquarters building.  E-mail from Associate General Counsel for Civil Rights and Finance, EPA, to Assistant General Counsel, GAO, *Subject: EPA Response to letter* (Mar. 28, 2018).  These are operated by EPA sub-organizations and are located three floors away from the Administrator's office.  *Id.*  The SCIF must be reserved to conduct an individual call.  *Id.*

[20] Section 711 of the Consolidated Appropriations Act, 2010 is the FY 2010 version of the FY 2017 section 710 statutory notification requirement at issue here; the language of these provisions is identical.  Pub. L. No. 115-31, div. E, title VII, § 710; Pub. L. No. 111-117, div. C, title VII, § 711, 123 Stat. 3034, 3207–08 (Dec. 16, 2009).

CONCLUSION

EPA violated section 710 of the Financial Services and General Government Appropriations Act, 2017 when it failed to notify the Committees on Appropriations of the House of Representatives and Senate prior to obligating in excess of $5,000 to install a soundproof privacy booth for the office of the Administrator during his period of appointment.  Because EPA used its appropriations in a manner specifically prohibited by law, EPA violated the Antideficiency Act.  EPA should report its Antideficiency Act violation as required by law.

If you have any questions, please contact Julia C. Matta, Managing Associate General Counsel, at (202) 512-4023, or Omari Norman, Assistant General Counsel for Appropriations Law, at (202) 512-8272.


Thomas H. Armstrong
General Counsel

# EXHIBIT 3

TREY GOWDY, SOUTH CAROLINA
CHAIRMAN

ONE HUNDRED FIFTEENTH CONGRESS

ELIJAH E. CUMMINGS, MARYLAND
RANKING MINORITY MEMBER

# Congress of the United States

## House of Representatives

COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

MAJORITY  (202) 225–5074
MINORITY  (202) 225–5051
http://oversight.house.gov

April 13, 2018

The Honorable Scott Pruitt
Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Dear Mr. Pruitt:

The Committee recently became aware of new information regarding your official travel and February 2017 lease agreement. In light of this new information, we request the following documents and information:

1. All documents and communications referring or relating to the official agency travel of EPA Senior Special Agent Pasquale "Nino" Perrotta between February 17, 2017, and April 13, 2018;

2. All documents and communications referring or relating to your complete itinerary for the June 2017 trip to Italy, including, but not limited to, your daily official calendar for June 7 to June 11, 2017, and travel vouchers for all EPA employees who accompanied you on the trip;

3. All documents and communications referring or relating to the hiring of a private Italian security firm for your trip to Italy;

4. All documents and communications referring or relating to your complete itinerary for the December 2017 trip to Morocco, including, but not limited to, your daily official calendar for December 9 to December 13, 2017, and travel vouchers for all EPA employees who accompanied you on the trip;

5. All documents and communications referring or relating to the decision to increase your level of security to 24-hour protection;

6. All documents and communications referring or relating to contracts between the EPA and private entities to perform security sweeps of your office; and

7. Documents and communications sufficient to identify the official who made the determination 24-hour protection was necessary.

The Honorable Scott Pruitt
April 13, 2018
Page 2

Please provide the requested documents and information as soon as possible but no later than April 27, 2018. An attachment to this letter provides additional instructions about responding to this request. In addition, contact the Committee by April 27, 2018, to schedule transcribed interviews with the following individuals:

1. Ryan Jackson, Chief of Staff;

2. Kevin Chmielewski, Deputy Chief of Staff;

3. Pasquale "Nino" Perrotta, Senior Special Agent;

4. Millian Hupp, Director of Scheduling and Advance; and

5. Sarah Greenwalt, Senior Counsel.

Please contact Caroline Nabity of the Majority staff at (202) 225-5074 with any questions. We also look forward to receiving the additional documents and information requested in the Committee's February 20 and April 11, 2018, letters. Thank you for your attention to this matter.

Sincerely,

Trey Gowdy

Enclosures

cc:   The Honorable Elijah E. Cummings

## Responding to Committee Document Requests

1. In complying with this request, you are required to produce all responsive documents that are in your possession, custody, or control, whether held by you or your past or present agents, employees, and representatives acting on your behalf.  You should also produce documents that you have a legal right to obtain, that you have a right to copy or to which you have access, as well as documents that you have placed in the temporary possession, custody, or control of any third party.  Requested records, documents, data or information should not be destroyed, modified, removed, transferred or otherwise made inaccessible to the Committee.

2. In the event that any entity, organization or individual denoted in this request has been, or is also known by any other name than that herein denoted, the request shall be read also to include that alternative identification.

3. The Committee's preference is to receive documents in electronic form (i.e., CD, memory stick, or thumb drive) in lieu of paper productions.

4. Documents produced in electronic format should also be organized, identified, and indexed electronically.

5. Electronic document productions should be prepared according to the following standards:

   (a) The production should consist of single page Tagged Image File ("TIF"), files accompanied by a Concordance-format load file, an Opticon reference file, and a file defining the fields and character lengths of the load file.

   (b) Document numbers in the load file should match document Bates numbers and TIF file names.

   (c) If the production is completed through a series of multiple partial productions, field names and file order in all load files should match.

   (d) All electronic documents produced to the Committee should include the following fields of metadata specific to each document;

   BEGDOC, ENDDOC, TEXT, BEGATTACH, ENDATTACH, PAGECOUNT,CUSTODIAN, RECORDTYPE, DATE, TIME, SENTDATE, SENTTIME, BEGINDATE, BEGINTIME, ENDDATE, ENDTIME, AUTHOR, FROM, CC, TO, BCC, SUBJECT, TITLE, FILENAME, FILEEXT, FILESIZE, DATECREATED, TIMECREATED, DATELASTMOD, TIMELASTMOD, INTMSGID, INTMSGHEADER, NATIVELINK, INTFILPATH, EXCEPTION, BEGATTACH.

6. Documents produced to the Committee should include an index describing the contents of the production.  To the extent more than one CD, hard drive, memory stick, thumb drive, box or folder is produced, each CD, hard drive, memory stick, thumb drive, box or folder should contain an index describing its contents.

7.  Documents produced in response to this request shall be produced together with copies of file labels, dividers or identifying markers with which they were associated when the request was served.

8.  When you produce documents, you should identify the paragraph in the Committee's schedule to which the documents respond.

9.  It shall not be a basis for refusal to produce documents that any other person or entity also possesses non-identical or identical copies of the same documents.

10. If any of the requested information is only reasonably available in machine-readable form (such as on a computer server, hard drive, or computer backup tape), you should consult with the Committee staff to determine the appropriate format in which to produce the information.

11. If compliance with the request cannot be made in full by the specified return date, compliance shall be made to the extent possible by that date.  An explanation of why full compliance is not possible shall be provided along with any partial production.

12. In the event that a document is withheld on the basis of privilege, provide a privilege log containing the following information concerning any such document: (a) the privilege asserted; (b) the type of document; (c) the general subject matter; (d) the date, author and addressee; and (e) the relationship of the author and addressee to each other.

13. If any document responsive to this request was, but no longer is, in your possession, custody, or control, identify the document (stating its date, author, subject and recipients) and explain the circumstances under which the document ceased to be in your possession, custody, or control.

14. If a date or other descriptive detail set forth in this request referring to a document is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the request, you are required to produce all documents which would be responsive as if the date or other descriptive detail were correct.

15. Unless otherwise specified, the time period covered by this request is from January 1, 2009 to the present.

16. This request is continuing in nature and applies to any newly-discovered information.  Any record, document, compilation of data or information, not produced because it has not been located or discovered by the return date, shall be produced immediately upon subsequent location or discovery.

17. All documents shall be Bates-stamped sequentially and produced sequentially.

18. Two sets of documents shall be delivered, one set to the Majority Staff and one set to the Minority Staff. When documents are produced to the Committee, production sets shall be delivered to the Majority Staff in Room 2157 of the Rayburn House Office Building and the Minority Staff in Room 2471 of the Rayburn House Office Building.

19. Upon completion of the document production, you should submit a written certification, signed by you or your counsel, stating that:  (1) a diligent search has been completed of all documents in your possession, custody, or control which reasonably could contain responsive documents; and (2) all documents located during the search that are responsive have been produced to the Committee.

## Definitions

1. The term "document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of how recorded, and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, inter-office and intra-office communications, electronic mail (e-mail), contracts, cables, notations of any type of conversation, telephone call, meeting or other communication, bulletins, printed matter, computer printouts, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and graphic or oral records or representations of any kind (including without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape or otherwise.  A document bearing any notation not a part of the original text is to be considered a separate document.  A draft or non-identical copy is a separate document within the meaning of this term.

2. The term "communication" means each manner or means of disclosure or exchange of information, regardless of means utilized, whether oral, electronic, by document or otherwise, and whether in a meeting, by telephone, facsimile, email (desktop or mobile device), text message, instant message, MMS or SMS message, regular mail, telexes, releases, or otherwise.

3. The terms "and" and "or" shall be construed broadly and either conjunctively or disjunctively to bring within the scope of this request any information which might otherwise be construed to be outside its scope.  The singular includes plural number, and vice versa.  The masculine includes the feminine and neuter genders.

4. The terms "person" or "persons" mean natural persons, firms, partnerships, associations, corporations, subsidiaries, divisions, departments, joint ventures, proprietorships, syndicates, or other legal, business or government entities, and all subsidiaries, affiliates, divisions, departments, branches, or other units thereof.

5.  The term "identify," when used in a question about individuals, means to provide the following information: (a) the individual's complete name and title; and (b) the individual's business address and phone number.

6.  The term "referring or relating," with respect to any given subject, means anything that constitutes, contains, embodies, reflects, identifies, states, refers to, deals with or is pertinent to that subject in any manner whatsoever.

7.  The term "employee" means agent, borrowed employee, casual employee, consultant, contractor, de facto employee, independent contractor, joint adventurer, loaned employee, part-time employee, permanent employee, provisional employee, subcontractor, or any other type of service provider.

**COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM**
**U.S. HOUSE OF REPRESENTATIVES**
**115TH CONGRESS**

**NOTICE OF APPEARANCE OF COUNSEL**

**Counsel submitting:** _____

**Bar number:** _____        **State/District of admission:** _____

**Attorney for:** _____

**Address:** _____

**Telephone: ( _____ ) _____ - _____**

**Pursuant to Rule 16 of the Committee Rules, notice is hereby given of the entry of the**

**undersigned as counsel for** _____ **in (select one):**

⦿ **All matters before the Committee**

◯ **The following matters (describe the scope of representation):**

_____

_____

**All further notice and copies of papers and other material relevant to this action should be**
**directed to and served upon:**

      **Attorney's name:** _____

      **Attorney's email address:** _____

      **Firm name (where applicable):** _____

      **Complete Mailing Address:** _____

                    _____

**I agree to notify the Committee within 1 business day of any change in representation.**

_____        _____
**Signature of Attorney**                                        **Date**

# EXHIBIT 4

TREY GOWDY, SOUTH CAROLINA
CHAIRMAN

ONE HUNDRED FIFTEENTH CONGRESS

ELIJAH E. CUMMINGS, MARYLAND
RANKING MINORITY MEMBER

# Congress of the United States

## House of Representatives

COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

MAJORITY  (202) 225–5074
MINORITY  (202) 225–5051

http://oversight.house.gov

April 11, 2018

The Honorable Scott Pruitt
Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Dear Mr. Pruitt:

On February 20, 2018, the Committee requested documents and other information regarding your official travel be produced by March 6, 2018.[1] The EPA provided some responsive documents on March 20, 2018, and subsequently shared additional documents in camera on April 9, 2018. Nevertheless, the EPA has failed to produce all the documents requested on February 20, 2018.

Specifically, EPA has not produced documents responsive to requests 3(a) and (b). Those requests cover, for each of your first or business class flights, documents related to whether an individual waiver or authorization to purchase a first or business class ticket for the flight was issued; and, if a waiver or authorization was issued, a copy of the waiver or authorization and any documents related to the reasoning for the waiver or authorization. These requests include, but are not limited to, any documents referring or relating to "specific, ongoing threats associated with the Administrator's air travel," which was the stated basis for obtaining first class tickets in a March 20, 2018, letter from EPA Associate Administrator Troy Lyons.[2]

Additionally, the Committee is evaluating a February 2017 lease agreement entered into by you and Ms. Vicki Hart.[3] The Committee obtained related memoranda issued by the agency's Designated Ethics Official on March 30, 2018, and April 4, 2018. The April 4, 2018, memorandum raises questions about whether ethics officials who reviewed the lease had access to all relevant information, and whether all applicable ethics rules were considered when those officials concluded the lease agreement complied with federal ethics regulations.[4]

---

[1] Letter from Rep. Trey Gowdy, Chairman, H. Comm. on Oversight & Gov't Reform, to Mr. Scott Pruitt, Adm'r, Envtl. Prot. Agency (Feb. 20, 2018).

[2] Letter from Troy Lyons, Assoc. Adm'r, Envtl. Prot. Agency, to Rep. Trey Gowdy, Chairman, H. Comm. on Oversight & Gov't Reform (March 20, 2018).

[3] Louis Nelson, *EPA Ethics Official Says He Didn't Have All 'Factual Information' on Pruitt's Lease*, POLITICO (Apr. 5, 2018, 7:34 AM), https://www.politico.com/story/2018/04/05/scott-pruitt-ethics-memo-503641.

[4] *Id.*

The Honorable Scott Pruitt
April 11, 2018
Page 2

These memoranda are insufficient to evaluate compliance with federal ethics rules. To assist the Committee in determining whether federal ethics regulations were followed with respect to the February 2017 lease, please produce the following:

1. All documents and communications referring or relating to the lease agreement entered into by you with Vicki Hart, including, but not limited to all communications between you and Steven Hart and/or Vicki Hart regarding the lease agreement;

2. Documents and communications referring or relating to the conclusions reached in the March 30, 2018, and April 4, 2018, ethics memoranda;

3. Documents and communications referring or relating to whether the actual use of the space was consistent with the lease terms; and

4. Documents and communications referring or relating to whether the lease agreement complied with 5 C.F.R. § 2635.502.

Provide the requested documents and information as soon as possible, but no later than April 25, 2018. An attachment to this letter provides additional instructions for responding to the Committee's request.

Please contact Caroline Nabity of the Majority staff at (202) 225-5074 with any questions about this request. Thank you for your attention to this matter.

Sincerely,

Trey Gowdy

Enclosure

cc:    The Honorable Elijah E. Cummings

**Responding to Committee Document Requests**

1. In complying with this request, you are required to produce all responsive documents that are in your possession, custody, or control, whether held by you or your past or present agents, employees, and representatives acting on your behalf.  You should also produce documents that you have a legal right to obtain, that you have a right to copy or to which you have access, as well as documents that you have placed in the temporary possession, custody, or control of any third party.  Requested records, documents, data or information should not be destroyed, modified, removed, transferred or otherwise made inaccessible to the Committee.

2. In the event that any entity, organization or individual denoted in this request has been, or is also known by any other name than that herein denoted, the request shall be read also to include that alternative identification.

3. The Committee's preference is to receive documents in electronic form (i.e., CD, memory stick, or thumb drive) in lieu of paper productions.

4. Documents produced in electronic format should also be organized, identified, and indexed electronically.

5. Electronic document productions should be prepared according to the following standards:

   (a) The production should consist of single page Tagged Image File ("TIF"), files accompanied by a Concordance-format load file, an Opticon reference file, and a file defining the fields and character lengths of the load file.

   (b) Document numbers in the load file should match document Bates numbers and TIF file names.

   (c) If the production is completed through a series of multiple partial productions, field names and file order in all load files should match.

   (d) All electronic documents produced to the Committee should include the following fields of metadata specific to each document;

   BEGDOC, ENDDOC, TEXT, BEGATTACH, ENDATTACH, PAGECOUNT,CUSTODIAN, RECORDTYPE, DATE, TIME, SENTDATE, SENTTIME, BEGINDATE, BEGINTIME, ENDDATE, ENDTIME, AUTHOR, FROM, CC, TO, BCC, SUBJECT, TITLE, FILENAME, FILEEXT, FILESIZE, DATECREATED, TIMECREATED, DATELASTMOD, TIMELASTMOD, INTMSGID, INTMSGHEADER, NATIVELINK, INTFILPATH, EXCEPTION, BEGATTACH.

6. Documents produced to the Committee should include an index describing the contents of the production.  To the extent more than one CD, hard drive, memory stick, thumb drive, box or folder is produced, each CD, hard drive, memory stick, thumb drive, box or folder should contain an index describing its contents.

7.  Documents produced in response to this request shall be produced together with copies of file labels, dividers or identifying markers with which they were associated when the request was served.

8.  When you produce documents, you should identify the paragraph in the Committee's schedule to which the documents respond.

9.  It shall not be a basis for refusal to produce documents that any other person or entity also possesses non-identical or identical copies of the same documents.

10. If any of the requested information is only reasonably available in machine-readable form (such as on a computer server, hard drive, or computer backup tape), you should consult with the Committee staff to determine the appropriate format in which to produce the information.

11. If compliance with the request cannot be made in full by the specified return date, compliance shall be made to the extent possible by that date.  An explanation of why full compliance is not possible shall be provided along with any partial production.

12. In the event that a document is withheld on the basis of privilege, provide a privilege log containing the following information concerning any such document: (a) the privilege asserted; (b) the type of document; (c) the general subject matter; (d) the date, author and addressee; and (e) the relationship of the author and addressee to each other.

13. If any document responsive to this request was, but no longer is, in your possession, custody, or control, identify the document (stating its date, author, subject and recipients) and explain the circumstances under which the document ceased to be in your possession, custody, or control.

14. If a date or other descriptive detail set forth in this request referring to a document is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the request, you are required to produce all documents which would be responsive as if the date or other descriptive detail were correct.

15. Unless otherwise specified, the time period covered by this request is from January 1, 2009 to the present.

16. This request is continuing in nature and applies to any newly-discovered information.  Any record, document, compilation of data or information, not produced because it has not been located or discovered by the return date, shall be produced immediately upon subsequent location or discovery.

17. All documents shall be Bates-stamped sequentially and produced sequentially.

18. Two sets of documents shall be delivered, one set to the Majority Staff and one set to the Minority Staff. When documents are produced to the Committee, production sets shall be delivered to the Majority Staff in Room 2157 of the Rayburn House Office Building and the Minority Staff in Room 2471 of the Rayburn House Office Building.

19. Upon completion of the document production, you should submit a written certification, signed by you or your counsel, stating that:  (1) a diligent search has been completed of all documents in your possession, custody, or control which reasonably could contain responsive documents; and (2) all documents located during the search that are responsive have been produced to the Committee.

## Definitions

1.  The term "document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of how recorded, and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, inter-office and intra-office communications, electronic mail (e-mail), contracts, cables, notations of any type of conversation, telephone call, meeting or other communication, bulletins, printed matter, computer printouts, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and graphic or oral records or representations of any kind (including without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape or otherwise.  A document bearing any notation not a part of the original text is to be considered a separate document.  A draft or non-identical copy is a separate document within the meaning of this term.

2.  The term "communication" means each manner or means of disclosure or exchange of information, regardless of means utilized, whether oral, electronic, by document or otherwise, and whether in a meeting, by telephone, facsimile, email (desktop or mobile device), text message, instant message, MMS or SMS message, regular mail, telexes, releases, or otherwise.

3.  The terms "and" and "or" shall be construed broadly and either conjunctively or disjunctively to bring within the scope of this request any information which might otherwise be construed to be outside its scope.  The singular includes plural number, and vice versa.  The masculine includes the feminine and neuter genders.

4.  The terms "person" or "persons" mean natural persons, firms, partnerships, associations, corporations, subsidiaries, divisions, departments, joint ventures, proprietorships, syndicates, or other legal, business or government entities, and all subsidiaries, affiliates, divisions, departments, branches, or other units thereof.

5.  The term "identify," when used in a question about individuals, means to provide the following information: (a) the individual's complete name and title; and (b) the individual's business address and phone number.

6.  The term "referring or relating," with respect to any given subject, means anything that constitutes, contains, embodies, reflects, identifies, states, refers to, deals with or is pertinent to that subject in any manner whatsoever.

7.  The term "employee" means agent, borrowed employee, casual employee, consultant, contractor, de facto employee, independent contractor, joint adventurer, loaned employee, part-time employee, permanent employee, provisional employee, subcontractor, or any other type of service provider.

**COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM**
**U.S. HOUSE OF REPRESENTATIVES**
**115TH CONGRESS**

**NOTICE OF APPEARANCE OF COUNSEL**

**Counsel submitting:** _____

**Bar number:** _____     **State/District of admission:** _____

**Attorney for:** _____

**Address:** _____

**Telephone: ( _____ ) _____ - _____**

**Pursuant to Rule 16 of the Committee Rules, notice is hereby given of the entry of the**

**undersigned as counsel for** _____ **in (select one):**

⦿ **All matters before the Committee**

◯ **The following matters (describe the scope of representation):**

_____

_____

**All further notice and copies of papers and other material relevant to this action should be
directed to and served upon:**

       **Attorney's name:** _____

       **Attorney's email address:** _____

       **Firm name (where applicable):** _____

       **Complete Mailing Address:** _____

                                _____

**I agree to notify the Committee within 1 business day of any change in representation.**

_____     _____
**Signature of Attorney**                                       **Date**